**MILITARY TOXICS PROJECT,**
Petitioner,

v.

**ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner, Administrator, U.S. Environmental Protection Agency, Respondents.**

No. 97–1342.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 2, 1998.

Decided June 30, 1998.

Tanya D. Greeley and Todd M. Hooker, student counsel, argued the cause for petitioner, with whom Rena I. Steinzor, Attorney, Charles Dodge, Eric Manas, Erik Rosanes, Lori Schectel and Anne Ward, student counsel, were on the briefs.

Naikang Tsao and David J. Kaplan, Attorneys, U.S. Department of Justice, argued the cause for respondents, with whom Lois J. Schiffer, Assistant Attorney General, and Jonathan Z. Cannon, General Counsel, Environmental Protection Agency, were on the brief.

Douglas H. Green argued the cause for intervenor-applicants Chemical Manufacturers Association, et al., with whom Ronald A. Shipley, James W. Conrad, Jr., and David F. Zoll were on the joint brief.

Before: EDWARDS, Chief Judge; GINSBURG and TATEL, Circuit Judges.

GINSBURG, Circuit Judge:

The Military Toxics Project seeks review of a final rule promulgated by the Environmental Protection Agency establishing the circumstances in which military munitions are deemed hazardous waste for purposes of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* *See* Military Munitions Rule, 62 Fed.Reg. 6622 (1997) (challenged portions codified at 40 C.F.R. Pt. 266). For the reasons set out below, we deny the petition for review.

## I. BACKGROUND

The RCRA establishes a comprehensive program to regulate the handling of "solid waste," a term defined broadly in the statute to include, with certain exceptions not relevant here, "any garbage, refuse . . . and other discarded material." 42 U.S.C. § 6903(27). A "hazardous waste" is a solid waste that may

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5). Subtitle C of the RCRA, 42 U.S.C. §§ 6921 *et seq.*, provides a stringent " 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste," *United Technologies v. United States EPA*, 821 F.2d 714, 716 (D.C.Cir.1987), and charges the Administrator of the EPA to "develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to

the provisions of [Subtitle C]." 42 U.S.C. § 6921(a).

## A. Statutory and Regulatory Definitions of "Solid Waste"

The regulations governing the identification and listing of hazardous waste, *see* 40 C.F.R. Pt. 261, include a definition of "solid waste" that "applies only to wastes that are also hazardous for purposes of the regulations implementing subtitle C of RCRA." 40 C.F.R. § 261.1(b)(1). In other words, for purposes of Subtitle C the EPA has provided a regulatory definition of solid waste that is distinct from the statutory definition. *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1314 (2d Cir.1993) ("The RCRA regulations create a dichotomy in the definition of solid waste").

The regulations define solid waste as "any discarded material" and in turn define discarded material as, among other things, "abandoned." 40 C.F.R. § 261.2(a). Material is deemed abandoned if it is:

(1) Disposed of; or

(2) Burned or incinerated; or

(3) Accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated.

40 C.F.R. § 261.2(b). According to the EPA, the element of abandonment in the regulatory definition of solid waste renders that definition somewhat narrower than the statutory definition, which encompasses "discarded material" without requiring that the material have been abandoned.

Only a type of waste meeting the narrower regulatory definition of solid waste can be a hazardous waste within the meaning of Subtitle C. A regulatory solid waste is deemed a hazardous waste for purposes of Subtitle C if the Administrator has specifically listed that type of waste as a hazardous waste, *see* 40 C.F.R. Pt. 261, Subpt. D, or if it exhibits any of four hazardous characteristics: ignitability, corrosivity, reactivity, or toxicity, *see id.* Subpt. C.

Although the EPA has narrowed the definition of solid waste for purposes of Subtitle C, the statute itself still provides the relevant definition for purposes of Subtitle G, which authorizes the Administrator (§ 7003)—or, indeed, "any person" (§ 7002(a)(1)(B))—to bring suit in order to force such action as may be necessary to abate "an imminent and substantial endangerment to health or the environment" caused by solid waste. 42 U.S.C. §§ 6972(a)(1)(B) & 6973; *see* 40 C.F.R. § 261.1(b)(2) (material not defined as solid waste for purposes of Subtitle C "is still a solid waste" if "[i]n the case of section 7003, the statutory elements are established").

The relevant portion of the regulatory apparatus erected by and under the authority of the RCRA can be summarized as follows: Solid waste is by statute defined broadly as any "discarded material"; by regulation, however, solid waste for purposes of Subtitle C includes only discarded material that has been "abandoned" in certain ways, of which the only one relevant here is by being "disposed of." As a result of this distinction between the statutory and regulatory definitions, while any discarded material that poses an imminent and substantial hazard may be the subject of a lawsuit brought pursuant to Subtitle G, only discarded material that has been "disposed of" can constitute hazardous waste that is subject to the stringent "cradle-to-grave" regulatory scheme of Subtitle C.

## B. The Military Munitions Rule

Section 3004(y) was added to the RCRA by the Federal Facility Compliance Act of 1992, Pub.L. No. 102–386, § 107, 106 Stat. 1505, 1513–14 (codified at 42 U.S.C. § 6924(y)). That section instructed the Administrator of the EPA to propose, "after consulting with the Secretary of Defense and appropriate State officials, regulations identifying when military munitions become hazardous waste for purposes of [Subtitle C] and providing for the safe transportation and storage of such waste." 42 U.S.C. § 6924(y)(1).

The Administrator responded to the mandate of § 3004(y) by promulgating the Military Munitions Rule, 40 C.F.R. Part 266 of which is the subject of this appeal. Subpart M of Part 266 governs the management of military munitions when the military or another party subject to the Rule either (1) fires munitions at a firing range or (2) trans-

ports or stores munitions that constitute hazardous waste. Also under challenge is the EPA's decision not to promulgate a rule addressing the status of military munitions at firing ranges that the military has closed or transferred from military control.

### 1. Munitions at firing ranges

In the preamble to the final Military Munitions Rule the EPA expressed its "opinion [that] the use of munitions does not constitute a waste management activity because the munitions are not 'discarded.'" 62 Fed. Reg. at 6630. Accordingly, the Rule provides that a military munition is not a regulatory solid waste when it is used "for its intended purpose," including training, research, testing, and

> [r]ecovery, collection, and on-range destruction of unexploded ordnance and munitions fragments during range clearance activities at active or inactive ranges. However, "use for intended purpose" does not include the on-range disposal or burial of unexploded ordnance and contaminants when the burial is not a result of product use.

40 C.F.R. § 266.202(a)(1)(iii).

A used or fired military munition comes within the regulatory definition of solid waste for purposes of Subtitle C when it is "transported off range or from the site of use · ... for the purposes of storage, reclamation, treatment, disposal, or treatment prior to disposal" or if it is "recovered collected, and then disposed of by burial, or landfilling either on or off a range." 40 C.F.R. § 266.202(c). A used or fired military munition that "lands off range and is not promptly rendered safe and/or retrieved," however, comes within the statutory but not the regulatory definition of solid waste. 40 C.F.R. § 266.202(d). Although this type of solid waste is not subject to the strictures of Subtitle C, Part 266 provides:

> Any imminent and substantial threats associated with any remaining material must be addressed. If remedial action is infeasible, the operator of the range must maintain a record of the event for as long as any threat remains. The record must in-

clude the type of munition and its location (to the extent the location is known).

40 C.F.R. § 266.202(d).

To sum up: The Military Munitions Rule provides that a military munition that lands on a firing range is not a solid waste and hence cannot be a hazardous waste for purposes of Subtitle C. If the munition lands off range and is not retrieved or rendered safe, then it is a statutory solid waste and hence subject to the authorities of Subtitle G for dealing with an imminent and substantial hazard. If someone moves a fired military munition off range or disposes of it on range, then it becomes a regulatory solid waste for purposes of Subtitle C.

### 2. · Munitions in storage and transport

The Department of Defense has issued comprehensive design and operating standards for the safe storage of all military munitions. *See* DOD Ammunition and Explosives Safety Standards, DOD 6055.9–STD (Oct.1992); Defense Transportation Regulation, Part II, Cargo Movement, DOD 4500.9–R (Apr.1996). The DOD has also made the standards for the transportation of hazardous materials promulgated by the Department of Transportation, *see* 49 C.F.R. §§ 100–179, 350–399, applicable to the transportation of military munitions. The EPA reviewed those standards "in detail" and determined that, although the DOD storage standards "have safety as the primary concern," they "meet or exceed RCRA standards in virtually all respects." 62 Fed.Reg. at 6637 (preamble). Similarly, the EPA concluded that the combined regulatory regimes of the Departments of Defense and of Transportation together "provide an equivalent level of protection of human health and the environment as the requirements of the RCRA manifest system." *Id.* at 6634.

The Military Munitions Rule takes the pre-existing DOD and DOT regulations into account by granting to nonchemical munitions that are being managed in accordance with those regulations a conditional exemption from classification as a hazardous waste for purposes of Subtitle C. *See* 40 C.F.R. §§ 266.203(a)(1) (transportation) & 266.205(a)(1) (storage). Thus, a non-chemical

military munition that meets the regulatory definition of solid waste, and that exhibits a hazardous waste characteristic or has been listed as a hazardous waste pursuant to 40 C.F.R. Part 261, is deemed not a hazardous waste for purposes of Subtitle C provided that it is being transported or stored in accordance with the applicable DOD regulations (and that it meets certain other criteria not relevant here).

### 3. Munitions at closed or transferred ranges

As originally proposed the Military Munitions Rule would have provided that a military munition left on a closed range or a range transferred out of military .control meets the statutory (but not the regulatory) definition of solid waste. *See* Military Munitions Rule, 60 Fed.Reg. 56,468, 56,492 (proposed Nov. 8, 1995) (to be codified at 40 C.F.R. § 261.1(g)(4)(i)). The EPA omitted this provision from the final Rule, however, with the following explanation:

> EPA's decision to postpone action on this section of the proposal is based in part on comments the Agency received on this issue and in part on the fact that DOD has not yet issued the range cleanup rule currently under development.... Many commenters questioned EPA's legal authority to defer RCRA coverage in favor of DOD regulations governing the cleanup of closed and transferred ranges. EPA will conduct further analyses of the comments and of the final DOD regulation.... If either DOD fails to proceed with the range rule or EPA finds that the range rule does not adequately protect human health and the environment, EPA will be prepared to address this issue under Federal environmental laws.

62 Fed.Reg. at 6632. The status of munitions at closed or fired ranges is yet to be determined.

### C. Judicial Review

The Military Toxics Project, which describes itself as "a nationwide coalition of citizens' groups," the members of which "live or work at or near the military facilities where the practices occur that are governed by the Military Munitions Rule," petitioned for review of the Rule. The Chemical Manufacturers Association and other trade associations moved to intervene on appeal and lodged a joint brief in support of the EPA.

## II. ANALYSIS

The MTP attacks the Military Munitions Rule as contrary both to the plain meaning of RCRA § 3004(y) and to the intent of the Congress in enacting that provision, and as "arbitrary and capricious because it is internally inconsistent, illogical, and ignores substantial record evidence." Specifically, the MTP objects to the EPA's positions that (1) because the normal and intended use of a used or fired military munition involves its application to the ground, such a munition has not been "discarded" within the regulatory definition of "solid waste"; (2) the agency may defer promulgation of a rule clarifying the regulatory status of military munitions on closed or transferred military ranges; and (3) the agency may conditionally exempt from regulation under Subtitle C nonchemical military munitions that are transported or stored in accordance with the applicable regulations promulgated by the Departments of Defense and of Transportation. The MTP also argues that under the Rule the DOD may impermissibly exempt itself, with regard to fired military munitions that land off range, from any cleanup responsibilities it deems "infeasible."

### A. Standing to Intervene

Before reaching the merits of the MTP's petition we must decide whether the CMA or any trade association joining its brief has standing under Article III of the Constitution of the United States to intervene in this case in support of the EPA. *See City of Cleveland v. Nuclear Regulatory Comm'n,* 17 F.3d 1515, 1516–18 (D.C.Cir.1994) (denying leave to intervene in support of a respondent agency pursuant to 28 U.S.C. § 2348 for want of standing).

An association has standing to sue on behalf of its members when:

(a) its members would otherwise have standing to sue in their own right; (b) the

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In this case all parties agree that the CMA has standing because some of its members produce military munitions and operate military firing ranges regulated under the Military Munitions Rule. These companies are directly subject to the challenged Rule, and they benefit from the EPA's "intended use" interpretation (under which most military munitions at firing ranges are not solid waste), the conditional exemption from regulation of storage and transportation under Subtitle C, and other features of the Military Munitions Rule that the MTP is challenging in this appeal. These CMA members would suffer concrete injury if the court grants the relief the petitioners seek; they would therefore have standing to intervene in their own right, and we agree with the litigants that the CMA has standing to intervene on their behalf in support of the EPA.

■ Because the CMA has standing, we need not determine whether the other intervenor-applicants listed on the CMA's brief also have standing. "[I]f one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case." *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 810 (D.C.Cir. 1993); *cf. Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 72 n. 16, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("We need not resolve the question of whether Duke Power is a proper party since jurisdiction over appellees' claims against the NRC is established, and Duke's presence or absence makes no material difference to either our consideration of the merits of the controversy or our authority to award the requested relief"). The presence of names other than that of the CMA on the intervenors' brief obviously makes no difference to our consideration of the arguments therein. Accordingly, having assured ourselves that the CMA has standing, we grant the pending motions to intervene, and we shall take the intervenors' arguments into account in addressing the merits of the MTP's claims.

■ The MTP has moved to strike portions of the intervenors' brief and of the materials appended thereto on the ground that the subject materials are not part of the administrative record. We deny the motion because the challenged materials—a policy document from the EPA and two reports from the General Accounting Office—are judicially cognizable apart from the record as authorities marshaled in support of a legal argument. *See* Fed. R.App. Proc. 28(a)(6) (brief must set forth contentions "with citations to the authorities, statutes, and parts of the record relied on").

## B. Standard of Review

In this case we may set aside the EPA's action in promulgating the Military Munitions Rule only if we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 42 U.S.C. § 6976(a); 5 U.S.C. § 706(a)(2). In determining whether a regulation is "in accordance with law" we apply the familiar two-step test of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984): if the Congress has "directly spoken to the precise question at issue," then we "must give effect to the unambiguously expressed intent of Congress"; otherwise we defer to the agency's reasonable interpretation of a statute it administers. *Id.* at 842–43, 104 S.Ct. 2778. Relatedly, we must give an agency's interpretation of its own regulation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

## C. Intended Use of Military Munitions

Under the challenged Rule a military munition is not a statutory or regulatory solid waste when it is used "for its intended purpose." 40 C.F.R. § 266.202(a)(1). According

to the preamble to the final Rule, firing a munition does not constitute discarding it, so a munition does not become a regulatory solid waste simply by hitting the ground and remaining there, *see* 62 C.F.R. at 6630, and most spent military munitions will not be regulated pursuant to Subtitle C. The EPA defends this aspect of the Rule as but one example of its "longstanding interpretation" of the regulatory definition of solid waste as excluding products, such as pesticides and fertilizers, the intended use of which involves application to the land. *Compare* 40 C.F.R. § 261.2(c)(1)(B)(ii) ("commercial chemical products ... are not solid wastes if they are applied to the land and that is their ordinary manner of use") *with id.* ·§ 261.33 (listing commercial chemicals that are hazardous wastes "when they are otherwise applied to the land in lieu of their intended use"). The MTP attacks the EPA's intended-use interpretation of § 3004(y)(1) as both contrary to the meaning and purpose of the statute and as arbitrary and capricious.

### 1. The statute

■ Section 3004(y)(1) requires the EPA to "adopt regulations identifying when military munitions become hazardous waste for purposes of [Subtitle C]." 42 U.S.C. § 6924(y)(1). According to the MTP, "[t]he use of the word 'when,' as opposed to the word 'if,' demonstrates an assumption by Congress that there are circumstances in which military munitions are 'discarded,' become solid waste, and are subject to regulation as hazardous waste." Perhaps so; in any event the EPA has identified such circumstances, *see* 40 C.F.R. § 266.202(b) & (c). The MTP nonetheless goes on to accuse the· EPA of avoiding the "clear congressional mandate" of § 3004(y)(1), apparently because the MTP believes the word "when" in that section implies the Congress contemplated that all military munitions would be subject to regulation pursuant to Subtitle C. While that is not an unreasonable reading of the statute, we think it hardly rises to the level of "the unambiguously expressed intent of Congress" required for the petitioner to prevail under *Chevron* step one.

■ Turning to the MTP's *Chevron* step two argument, we see that in the preamble to the final Rule the "EPA interprets RCRA 3004(y) as only requiring the Agency to identify the circumstances under which military munitions become subject to the regulatory scheme for identified or listed hazardous waste promulgated under Subtitle C." 62 Fed.Reg. at 6632. We are inclined to agree with the EPA that, read in context, this is the more natural meaning of the word "when." In any event, under *Chevron* step two we defer to the EPA's reasonable interpretation. *See, e.g., Engine Mfrs. Ass'n v. United States EPA,* 88 F.3d 1075, 1087 (D.C.Cir.1996) (upholding the EPA's interpretation of the statutory term "new"). Accordingly, we ̇ hold that the EPA did not violate § 3004(y) of the RCRA when it excluded from the regulatory definition of solid waste used or spent munitions lying on the ground.

### 2. Arbitrary and capricious review

■ The MTP argues that the intended-use interpretation of § 3004(y)(1), as applied to military munitions, is arbitrary and capricious for three reasons. First, the MTP maintains that the intended-use principle is inapposite to military munitions because once a military munition fired from a weapon hits the ground, the unexploded ordnance or explosive residue serves no further purpose; it should therefore be regarded as discarded within the regulatory definition of solid waste. For the same reason the MTP distinguishes military munitions from pesticides and fertilizers, which do perform a function after they have been applied to the ground.

The distinction that the MTP draws between munitions and other chemicals applied to the ground is perhaps a reasonable one; the question for present purposes, however, is not whether the MTP's position is reasonable but whether the EPA's position is arbitrary and capricious. The EPA considered and rejected the MTP's view, deciding instead to focus upon "whether a product was used as it was intended to be used, not on whether the purpose of the product is to perform some function once on the ground." 62 Fed.Reg. at 6630. The MTP has provided

no reason for us to think that the EPA's focus is irrational or inconsistent with other policies. *See id.* ("the use of explosives (e.g., dynamite) for road clearing, construction, or mining does not trigger RCRA regulation, even though any residuals on the ground serve no further function").

Second, the MTP argues that the Military Munitions Rule is internally inconsistent because it does not regulate fired munitions that are left undisturbed but does regulate munitions that are buried after firing. The EPA responds that, unlike the use of a munition—including its landing on the ground—the subsequent recovery and burial of a munition, or its placement in a landfill, is an act of discarding "because munitions are not produced to be buried or landfilled." We agree with the EPA that the difference in regulatory treatment does not evince a logical flaw in the final Rule.

Finally, the MTP objects that the EPA has not consistently applied its intended-use interpretation because, while a spent munition lying undisturbed on a firing range is not a solid waste, a spent munition that lands off range is a solid waste if it "is not promptly rendered safe and/or retrieved." 40 C.F.R. § 266.202(d). If firing constitutes use of the product, the MTP suggests, then the regulatory status of the fired munition should not depend upon where the munition happens to fall. The EPA answers that the MTP confuses the statutory and regulatory definitions of solid waste. More particularly, the agency explains that a spent munition that has landed, no matter where it comes to ground, is not for that reason subject to the regulatory program of Subtitle C. If the munition lands off range, however, and is not promptly retrieved or rendered safe, then the EPA regards it as having been "discarded" within the statutory (but not the regulatory) definition of solid waste and thus potentially subject to the provisions of Subtitle G that empower both the agency and private litigants to sue in order to compel the abatement of an imminent environmental threat. In this respect an off-range landing is like an accidental spill; in either event, the failure to respond properly can trigger a suit to compel action pursuant to Subtitle G. *See* 62 Fed.

Reg. at 6633. Because the EPA's interpretation of its own regulation is neither plainly erroneous nor inconsistent with the regulation, we accept it as controlling. *See Stinson,* 508 U.S. at 45, 113 S.Ct. 1913.

D. "Infeasibility"

■ The MTP mounts a second, distinct attack upon the provision in the Military Munitions Rule that classifies as a statutory solid waste a fired military munition that lands off range and is neither retrieved nor rendered safe. *See* 40 C.F.R. § 266.202(d). In that provision the EPA declares that "any imminent and substantial threats associated with any remaining material must be addressed" but then goes on to provide that "[i]f remedial action is infeasible, the operator of the range must maintain a record of the event for as long as any threat remains." *Id.* The MTP asserts that this section allows the DOD, by determining that remedial action is "infeasible," unilaterally to exempt itself from any cleanup of off-range military munitions that might otherwise be required by the RCRA.

The EPA responds that the disputed provision "does not relieve DOD from any required remedial action based upon their own infeasibility finding; rather, it imposes affirmative documentation requirements where remediation is infeasible." The agency goes on to point out:

> With or without this provision, the courts (in the judicial context), or EPA (in the administrative context) will determine the level of any cleanup required under the relevant enforcement or corrective action authorities, including whether or not remediation is infeasible.

It therefore appears that the MTP's argument may simply be based upon a faulty interpretation of the regulation. We need not reach this challenge on the merits, however, because as the EPA also points out neither the MTP nor anyone else commented during the rulemaking process that the Rule as drafted would permit the DOD unilaterally to free itself from the strictures imposed by the RCRA. The MTP has thus waived the argument and may not raise it for the first time upon appeal. *See Natural Re-*

*sources Defense Council v. EPA,* 25 F.3d 1063, 1073–74 (D.C.Cir.1994); *cf. Saco River Cellular, Inc. v. FCC,* 133 F.3d 25, 34 (D.C.Cir.1998), quoting *United States v. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice"). ·

### E. Munitions at Closed or Transferred Ranges

■ The EPA included in the proposed Rule, but omitted from the final Rule, a provision that would have identified as statutory solid waste fired military munitions at ranges that have been closed or transferred from military use. *Compare* 60 Fed.Reg. at 56,475–76 (proposed Rule) *with* 62 Fed.Reg. at 6632 (final Rule). As we have seen (in Part I.B.3 above), the EPA decided to postpone action on this section of the proposed Rule in order to analyze further the comments it received and to allow the DOD to complete work on its own proposed rule governing range cleanup. *See* 62 Fed.Reg. at 6632.

The MTP claims that the EPA was obliged by § 3004(y) to issue the proposed regulation. We disagree. Section 3004(y) requires only that EPA promulgate regulations to identify "when military munitions become hazardous waste for purposes of [Subtitle C]." As the EPA noted in the preamble to the final Rule, "[p]roposed § 261.2(g)(4)(i) would have identified when a discharged munition becomes a statutory solid waste, but would not identify when that discharged munition becomes subject to Subtitle C regulation." 62 Fed.Reg. at 6632. The EPA satisfied the requirements of § 3004(y) when it determined that military munitions used as intended do not fall within the regulatory definition of solid waste for purposes of Subtitle C—a determination that applies regardless whether the range at which the munition is used be active, inactive, closed, or transferred from military use. The agency had no obligation to address the broader issue con-

cerning statutory solid waste. That the EPA chose to tackle the statutory definition of solid waste as applied to off-range spent munitions that are not rendered safe or retrieved is not a ground upon which to fault the agency for postponing its treatment of the issue as applied to munitions at closed or transferred ranges.

### F. Conditional Exemption for Transportation and Storage

The Military Munitions Rule exempts from regulation pursuant to Subtitle C non-chemical military munitions in transport or storage if they are managed in accordance with applicable regulations of the Departments of Defense and of Transportation. *See* 40 C.F.R. §§ 266.203 & 266.205. The MTP argues that this so-called conditional exemption is not authorized by RCRA § 3001(a), is prohibited by § 3004(y), and is arbitrary and capricious because the DOD transportation and storage regulations are not as protective as the Subtitle C regulatory scheme.

#### 1. The statute

Section 3004(y)(1) of the RCRA provides that

> the Administrator shall propose ... regulations identifying when military munitions become hazardous waste for purposes of this subchapter and providing for the safe transportation and storage of such waste.

42 U.S.C. § 6924(y)(1). In the MTP's view conditional exemption of munitions transported or stored pursuant to DOD and DOT regulations is inconsistent with the EPA's obligation to "propose ... regulations" as the statute commands.

The flaw in the MTP's argument is that it assumes that material that has the benefit of the conditional exemption is "hazardous waste for purposes of this subchapter [i.e., Subtitle C]." The effect of the conditional exemption, however, is to remove the exempted munitions from coverage under Subtitle C and therefore from the range of wastes for which the EPA must promulgate regulations governing transportation and storage. Put another way, the statute requires that the EPA undertake a two-step

process: first, identify the conditions under which military munitions become hazardous waste; second, promulgate regulations to ensure the safe transportation and storage of that hazardous waste. The MTP mistakenly ignores the first step. Because the EPA has conditionally exempted certain munitions waste from classification as hazardous waste at the first step, the obligation to promulgate regulations governing the transportation and storage of that waste never arises at the second step. The MTP thus accuses the EPA of failing to fulfill an obligation that simply is not there—assuming, that is, the agency has the authority conditionally to exempt the munitions from classification as hazardous waste.

■■■ The EPA claims authority to issue a conditional exemption in part from § 3001(a), which requires the Administrator to promulgate criteria for identifying and listing wastes that "should be subject to the requirements of [Subtitle C]." 42 U.S.C. § 6921(a). As the Congress has not spoken directly to the issue of conditional exemptions, we must uphold the EPA's interpretation of the RCRA so long as that interpretation is reasonable in light of the structure and purpose of the statute.

The EPA reads the word "should" in § 3001(a) as calling for an exercise of judgment and hence conferring discretion upon the Administrator "to determine when Subtitle C regulation is appropriate." 62 Fed. Reg. at 6636. The next three sections of the RCRA direct the EPA to issue regulations governing the management of hazardous waste "as necessary to protect human health and the environment." 42 U.S.C. §§ 6922(a), 6923(a), 6924(a). Putting the four sections together, the agency reasons that the decision whether a waste should be regulated under Subtitle C turns upon its assessment of whether such regulation is necessary to protect human health and the environment. See 62 Fed.Reg. at 6636. Because a hazardous waste is by definition a solid waste that poses "a substantial threat to human health and the environment when improperly treated, stored, transported, or disposed of, or otherwise managed," 42 U.S.C. § 6903(5), the EPA concludes that "where a waste might

pose a hazard only under limited management scenarios, and other regulatory programs already address such scenarios, EPA is not required to classify a waste as hazardous waste subject to regulation under Subtitle C." 62 Fed.Reg. at 6636.

We accept the EPA's reading as a permissible construction of the statute. We have previously acknowledged that the "Congress' broad delegation to EPA to develop criteria for listing hazardous wastes, 42 U.S.C. § 6921(b), indicates that Congress intended the agency to have substantial room to exercise its expertise in determining the appropriate grounds for listing." _NRDC v. EPA_, 25 F.3d at 1070. In that same case we upheld the EPA's decision not to list used oil as a hazardous waste based upon its finding that the existing network of federal regulations ensured proper disposal. _Id._ at 1071. Although the present case does not involve the listing regulations at issue in _NRDC v. EPA_, we think the principle at work there also supports the conditional exemption at issue here. And as noted above, we find nothing in § 3004(y) that would restrict the ability of the EPA to grant conditional exemptions for military munitions.

### 2. Arbitrary and capricious review

■■■ The MTP attacks the conditional exemption for transportation and storage on the ground that it arbitrarily exempts the military from certain restrictions that appear in Subtitle C but not in the corresponding DOD regulations. For instance, Subtitle C relies upon the issuance of permits as a vehicle for regulating the treatment, storage, and disposal of hazardous waste, _see_ 42 C.F.R. § 6925(a), and the permitting process provides, among other things, for participation by the public (_id._ § 6974(b)(2)(A)) and facility-wide cleanup of contamination (_id._ § 6924(u)). The MTP "object[s] to EPA's decision not to incorporate [the DOD's storage and transportation] standards into a regulation that would also implement the additional RCRA requirements" not included in the DOD regulations.

As the intervenors correctly observe, the MTP's argument is essentially the same as the argument we rejected in _NRDC v. EPA,_

25 F.3d at 1071–72, where we considered the EPA's specification of the factors it would consider in deciding whether to list a waste as hazardous. Noting that one such factor is "[a]ction taken by other governmental agencies or regulatory programs" to control any hazard posed by the substance, 40 C.F.R. § 261.11(a)(3)(x), we said:

> To accept petitioners' proposition that EPA may not rationally rely on other federal regulatory programs because none are as comprehensive as subtitle C would be to drain this factor of all content: EPA could never rely on other environmental regulations to control a potentially hazardous substance because no other environmental regulation can match the might of subtitle C.

*Id.* at 1072. Insofar as the present petitioner seeks categorically to prevent the EPA from taking account of other regulatory programs in evaluating the need for it to act, we again reject that position.

Comparing the DOD regulations at issue here with regulation under Subtitle C, the EPA does not deny that there are "gaps in certain procedural requirements and in areas unrelated to risks from explosive materials." 62 Fed.Reg. at 6637. Significantly, however, the MTP disavows any challenge to the "technical soundness" of the DOD regulations; indeed, the MTP concedes that those regulations "impose reasonably protective standards" upon the transportation and storage of military munitions. Accordingly, we have no reason to doubt the EPA's determination that any gaps in the DOD regulations do not "undermine the protection of human health and the environment in any significant way," and that the imposition of the full panoply of Subtitle C regulation would not "significantly increase protection." *Id.*

We also reject as simply mistaken the MTP's argument that the conditional exemption impermissibly allows the military "to regulate itself" because the party responsible for the storage or transportation of the waste must report noncompliance with DOD regulations only insofar as it determines that the noncompliance "may endanger health or the environment." The EPA interprets the Military Munitions Rule as requiring notice of all instances of noncompliance, not only those that in the judgment of the transporting or storing military authority "may endanger health or the environment." That interpretation is fully supported by the text of the relevant regulations, which call for reporting "any failure to meet a condition" for exemption. 40 C.F.R. §§ 266.203(a)(1)(iv) & 266.205(a)(1)(v).

The MTP makes still other objections to the conditional exemption, but none warrants treatment in a published opinion. We uphold the conditional exemption as a permissible construction of the RCRA and a rational—not an arbitrary and capricious—policy choice.

## III. CONCLUSION

For the foregoing reasons we grant the motions for leave to intervene, deny the motion to strike portions of the intervenors' brief, and deny the petition for review.

*So ordered.*