**AUTOMATED POWER EXCHANGE, INC., Petitioner**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Pacific Gas and Electric Company, et al., Intervenors**

No. 98–1415.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1999.

Decided March 7, 2000.

Martin V. Kirkwood argued the cause for petitioner. With him on the briefs was Clark Evans Downs.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Automated Power Exchange, Inc. ("APX") petitions for review of two orders of the Federal Energy Regulatory Commission ("FERC") asserting jurisdiction over APX as a public utility within the meaning of the Federal Power Act and requiring APX to file certain information about itself. APX operates a computerized marketplace in which buyers and sellers of electric energy enter into short-term power supply contracts at prices displayed by the APX computer, subject to the buy and sell limits established by market participants. FERC concluded that because the APX computer plays a role in setting market price, APX is a public utility subject to regulation under the Federal Power Act. *See* 16 U.S.C. § 824(b) (1994).

APX contends that FERC has impermissibly expanded its limited jurisdiction to include, for the first time, entities that neither sell nor transmit power in interstate commerce but only facilitate trades.

Viewing itself as no more than a "high tech power broker," APX maintains that FERC's orders rely on a faulty understanding of APX's marketplace and are contrary to long-standing agency precedent defining the characteristics of a public utility. APX contends, alternatively, that assuming FERC's jurisdiction, FERC has arbitrarily imposed different filing requirements on it than have been imposed on similarly situated entities.[1] Because FERC's interpretation of the Federal Power Act is entitled to deference and FERC has distinguished APX from the entities over which it previously has declined to assert jurisdiction and has explained why its decision here is in harmony with its relevant precedent, we deny the petition for review.

## I.

The instant case began when APX filed an application requesting that FERC disclaim jurisdiction over its operation, or, alternatively, grant APX market-based rate authority, accept for filing its rate schedule to become effective January 1, 1998, and waive prior notice and other filing requirements and annual charges. The Federal Power Act ("FPA" or "the Act") applies to the transmission or sale at wholesale of electric energy in interstate commerce, *see* FPA § 201(b)(1), 16 U.S.C. § 824(b)(1) (1994), and FERC's jurisdiction extends over all facilities for such transmission or sale of electric energy. *See id.* As a result, FERC has jurisdiction over any "public utility," which the Act defines as any person who owns or operates facilities subject to FERC's jurisdiction. FPA § 201(e), 16 U.S.C. § 824(e) (1994).

In its application, APX asserted that it will not be a public utility under the FPA

---

1. The petitions of APX and the California Power Exchange Corporation ("CalPX") challenging FERC's imposition of the annual fee paid by other public utilities have become unripe as a result of FERC's decision to waive the annual fee until it has conducted a general review of the issue. *See PJM Interconnection, L.L.C.,* 88 FERC ¶ 61,109 at p. 61,257–58

(1999); *on reh'g,* 89 FERC ¶ 61,133 (1999). Accordingly, the court granted petitioners' motion to dismiss CalPX's appeal in No. 98–1419 and that portion of APX's petition challenging the annual fee. *See Automated Power Exch. v. FERC,* 1999 WL 1215753 (D.C.Cir. Nov.30, 1999).

because it will not make sales for resale of electric power in interstate commerce or transmit electric energy therein, and will not own or operate any facilities subject to FERC's jurisdiction. Furthermore, APX stated that it will not take title to the electricity which is sold, will not exercise control over decisions by any market participant to purchase or sell electricity, and will not dictate prices at which a buyer or seller must transact. Rather, APX claimed, it will serve as an information management agent for buyers and sellers of electricity that choose to voluntarily trade using APX's services. Thus, APX's application put before FERC the question whether a new market institution that will operate as an electric power exchange is a public utility as defined in the Federal Power Act and is therefore subject to FERC's jurisdiction.

In the orders under review, FERC acknowledged that the archetypal "facilities" under the Act are power generating plants and transmission lines, but also recognized that the phrase "facilities ... for sale" has long been read broadly to include, among other intangibles, contracts used by resellers. *See Automated Power Exchange, Inc.*, 82 FERC ¶ 61,287 at p. 62,-106 (1998) ("Hearing Order"); *see also Hartford Elec. Light Co. v. FPC*, 131 F.2d 953, 961 (2d Cir.1942); *Citizens Energy Corp.*, 35 FERC ¶ 61,198 at p. 61,453 (1986). FERC recognized that APX does not own or operate either traditional physical facilities used to transmit power or paper facilities used to resell power. However, FERC had recognized a new kind of public utility in recent decisions concerning the California Power Exchange ("CalPX"), a state-created marketplace that operates in the geographic area in which APX seeks to compete. In its CalPX orders, FERC had construed the FPA's provision covering facilities for wholesale sale of electrici-

ty to include the operators of a power exchange if the operator exercises "effective control" over sales in the marketplace, *Pacific Gas and Elec. Co. et al*, 77 FERC ¶ 61,204 at p. 61,805 (1996) ("First CalPX Order") or, alternatively, if the operator is an "integral part of the transactional chain." *Southern Cal. Edison Co.*, 80 FERC ¶ 61,262 at p. 61,946 (1997) ("Second CalPX Order").[2] FERC thus concluded that, like CalPX, APX also exercised "effective control" over sales in its market and was an "integral part of the transactional chain" because "APX will determine the market price at which energy will be sold, and [ ] it will take the combined actions of the seller and buyer participants as well as APX to effectuate wholesale sales." Hearing Order, 82 FERC at p. 62,108; *see also Automated Power Exchange, Inc.*, 84 FERC ¶ 61,020 at p. 61,-085–86 (1998) ("Rehearing Order"). FERC rejected the argument that APX was more like the computerized bulletin board system over which FERC had disclaimed jurisdiction in *Continental Power Exchange*, 68 FERC ¶ 61,235 (1994), noting that unlike APX's market, participants in Continental's system determined price through direct negotiation. *See* Hearing Order, 82 FERC at p. 62,108–09. Upon denying the petition for rehearing, FERC ordered APX to file a "detailed description and explanation of its services, including the calculation of market price, fees, and all relevant terms" as described in its order. Rehearing Order, 84 FERC at p. 61,089–91.

## II.

To appreciate the substance of APX's challenges to the orders under review and FERC's reasoning, some background concerning changes in the electric power industry and how the APX market operates is needed.

2. Because FERC's jurisdiction over CalPX had not been contested, FERC had pithily described that the key attributes of CalPX's operations that rendered it jurisdictional were that CalPX would control sales in its market by aggregating supply and demand, setting price, and matching buyers and sellers, *see, e.g.*, First CalPX Order, 77 FERC at p. 61,-806–07, and that CalPX was a necessary intermediary through which all sales would take place. *See* Second CalPX Order, 80 FERC at p. 61,946.

At the end of the twentieth century, the wholesale electric power industry was undergoing a significant transformation. Beginning with Congress' decision to mandate that certain power generators be allowed to "wheel" power,[3] the traditional monopoly structure of the power industry began breaking down, *see Campaign for a Prosperous Georgia v. SEC*, 149 F.3d 1282, 1284 (11th Cir.1998), so that by the mid–1990s a wholesale market for low-cost power generated by a variety of power sellers had emerged and traditional vertically integrated utilities were competing for sales of power at wholesale. FERC, in response to enactment of the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, 2905–21 (1992), *codified at* 42 U.S.C. §§ 13201–13556 (1994), promulgated Order No. 888, *Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities*, 61 Fed.Reg. 21,-540 (1996), *codified as revised at* 18 C.F.R. Pts. 35 & 385 (1999),[4] which "transformed the competitive environment." *Louisiana Energy and Power Auth. v. FERC*, 141 F.3d 364, 370 (D.C.Cir.1998).

As a result, FERC notes in it brief, the industry now consists of a variety of electric power sellers and power marketers, which purchase and resell power generated by others. APX seeks to market its services to participants in the electric power market in the western United States, of which California is the hub, consuming nearly half of the power generated in the entire region. As of 1997, approximately 100 entities traded power in the western market; furthermore, according to FERC, 650 entities in addition to the owners and operators of physical facilities have applied to act as middlemen (resellers) of power nationwide.[5]

■ Prior to the emergence of power exchanges, the industry had developed standardized power contracts covering five periods of time, ranging from power for the following month to power in the next hour.[6] Of these, the most prevalent have been contracts formed in the spot market for next-day and hour-ahead power. According to APX's brief, beginning in the mid–1980s, buyers and sellers in both the long-term and spot markets found each other through power brokers or power marketers,[7] a practice that made sense

3. "Wheeling" involves a transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility. *See* Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §§ 796(17)-(18), 824a–3, 824i, 824k (1994); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 368, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); Richard D. Cudahy, *Retail Wheeling: Is This Revolution Necessary?*, 15 ENERGY L.J. 351, 351 & n.2 (1994); *cf. Association of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1429 (D.C.Cir.1996).

4. For the revisions and clarifications of Order No. 888, see 76 F.E.R.C. ¶ 61,009 (1996), 76 F.E.R.C. ¶ 61,347 (1996), and 79 F.E.R.C. ¶ 61,182 (1997), *on reh'g*, Order No. 888–A, 62 Fed.Reg. 12274 (1997), *on reh'g*, Order No. 888–B, 81 F.E.R.C. ¶ 61,248 (1997), *on reh'g*, Order No. 888–C, 82 F.E.R.C. ¶ 61,046 (1998), *on appeal sub nom. Transmission Access Policy Study Group, et al. v. FERC*, No. 97–1715 (D.C.Cir.) (submitted November 3, 1999).

5. This number does not necessarily reflect 650 new entrants because a number of traditional utilities are divesting themselves of their generating facilities and focusing on the transmission business. *See, e.g.,* Second CalPX Order, 80 FERC at p. 61,944.

6. Long-term (month-ahead) contracts are designed to meet easily foreseeable demand in order to assure that a utility whose demand routinely exceeds its own supply can meet its baseload requirements, to supplement power to meet seasonal demand, or to assist in financing investment in power generation. Since 1996, the New York Mercantile Exchange has provided a market in which month long contracts can be traded. By contrast, short-term contracts meet less foreseeable demand, such as that caused by a heatwave, and are divided into periods of (1) 23 days (power each day during the 16 hours of peak demand); (2) 6 days (same); (3) next-day (peak or off-peak); and (4) hour-ahead.

7. A power broker seeks out potential buyers or sellers on behalf of an undisclosed princi-

when the universe of potential buyers and sellers was small, and considerations other than price were at issue. The arrival of market-based rate authority, and open access tariffs has sparked an interest among industry participants to eschew brokers and marketers in favor of trading power in a marketplace, particularly in the spot market where transaction costs have come to be perceived as too high.

To spur development of such a marketplace, the California Public Utilities Commission ("CPUC") created the California Power Exchange. Buyers and sellers submit bids to CalPX, which ranks, evaluates, and matches the bids. Bids are phrased in terms of megawatt hours whereby participants offer to contract, for example, for power to be delivered during the peak hours the following day. There is one round of bidding, after which CalPX assesses the aggregate supply and demand for each hour of power. Although CalPX is not formally a party to the contracts, CalPX matches buyers and sellers for each hour of power at a price and on terms determined by CalPX. *See* First CalPX Order, 77 FERC at p. 61,806–07. To ensure that an adequate supply of power would be available in the fledgling market, the CPUC directed the three largest investor-owned public utilities in California to sell their entire power supply through the

CalPX through the year 2001. *See id.* at p. 61,803–05.

APX was established to compete with CalPX. Like CalPX, APX operates separate hourly markets, although APX's market is more expansive, dividing California into two power zones and allowing participants to contract for up to 168 hours (one week's worth) of power.[8] Unlike in CalPX's market, bidding is ongoing in the APX market and prices fluctuate from the opening of trading until trading stops shortly before delivery. However, price fluctuations in the APX market are a function of the APX computer's algorithm rather than a reflection of direct price negotiations by market participants. Thus, when a new hourly market opens, the APX computer, acting as electronic auctioneer, displays an initial price per megawatt hour based on the price for power of the same hour of the day in the previous seven days. Responding to the initial price, participants enter buy or sell orders. The orders specify the quantity sought or offered, and may contain price or time limits within which the APX computer shall fulfill an order. If neither limitation is set, the order remains pending until matched, and is for whatever is the market price displayed by the APX computer at the time the computer finds a matching order. Then, after displaying

pal and proposes the terms on which the principal is willing to deal. At oral argument, it was clarified that once a compatible counterpart has been identified and the broker either commences, or even concludes, negotiations, at some point the broker steps back from the transaction, which is concluded directly between principals. Thus, while the broker may have facilitated price negotiations, the principals have not bound themselves to accept the price the broker negotiates. Unlike a broker, a power marketer is a reseller who may not own or operate generating or transmission facilities but who purchases (takes title) to power and then resells (conveys title) it to its customers. *See generally Citizens Energy Corp.*, 35 FERC ¶ 61,198 (1986).

8. Because each hour of power is traded separately, prices will fluctuate for each hour. For example, assume it is 10:00 a.m on Monday, November 22, 1999. Consistent with current practice, APX allows for purchase of hour-ahead power, i.e., from 11:00 a.m. to 12:00 p.m. of that day through and until one week from that point. If the price per megawatt for the period between 11:00 a.m. to 12:00 p.m. is *X*, the price for power from 12:00 p.m. to 1:00 p.m. could be *Y*; and the price for the 1:00 p.m. to 2:00 p.m. period could be *Z*; and so on until 168 hours later: 9:00 a.m. to 10:00 a.m. of the following Monday. When it becomes 11:00 a.m. on Monday, November 22, trading stops for the hour of 11:00 a.m. to 12:00 p.m. and trading opens for the next hour one week later, i.e. 10:00 a.m. to 11:00 a.m. on Monday, November 29, 1999, and all hours prior. Thus, at any given time, the APX markets cover the next 168 hours. And the markets in each of the two California zones are independent so that the price of power from 10:00 a.m. to 11:00 a.m. on November 22nd may differ between zones.

the initial price, the APX computer alters the price periodically in response to the activity of the participants. The price does not fluctuate with each new order placed. Rather, at certain unspecified intervals, the APX computer clears the market by matching as many buy and sell orders as it can at the then-displayed price. This matching process forms binding contracts.[9] The market-clearing process continues throughout the 168–hour period in which trading for that hour of power occurs, happening with increasing frequency as the time for delivery approaches. Each time after clearing the market, the APX computer alters the displayed price, raising it if the majority of unmatched orders are to buy (demand exceeds supply) and lowering it if unmatched orders are to sell (supply exceeds demand). The amount of the price fluctuation is a function of the APX computer's nonpublic algorithm.

Consequently, the phrase "market price" when used in relation to the APX marketplace describes the price APX's computer estimates to be most likely to clear the market rather than the more common meaning in other contexts, i.e., a price at which willing buyers and sellers have agreed to trade.[10] While participants can set the price range or price limits, only APX can set the final price at which the sale is actually transacted. APX acknowledges that it could have designed its computer program to allow participants to negotiate price by including a price term in their respective offers, but APX considered that a less efficient means of operating a power exchange. Although APX

considers its computer generated "market price" to be a feature likely to attract participants to its market, from FERC's perspective, it is precisely this feature that makes APX a public utility.

## III.

APX challenges FERC's assertion of jurisdiction over it on several grounds. First, APX contends that the plain meaning of "sale" in the FPA or as construed previously by FERC and the courts limits FERC's jurisdiction to those entities that as "public utilities" transmit or take title to power. Second, APX contends that even if the language of the FPA can reasonably be interpreted to include as a "public utility" an entity that exercises control over sales without taking title to power, FERC's interpretation was arbitrary and capricious because it failed to follow or explain its departure from its precedents distinguishing the jurisdictional treatment of power brokers and power marketers. Third, APX contends that even if FERC's statutory interpretation is consistent with its precedent, FERC arbitrarily applied that interpretation to the APX market by concluding that the price-setting feature of APX's computer made APX more like CalPX, over which FERC had asserted jurisdiction, than like the computerized bulletin board system over which FERC had disclaimed jurisdiction in *Continental Power Exchange*, 68 FERC¶ 61,235 (1994). Finally, APX contends that even if it is subject to FERC's jurisdiction, FERC arbitrarily imposed filing requirements on it different from those imposed on similarly situated entities.

---

9. For example, if a seller offered to sell at or above $8.00 per megawatthour and a buyer offered to buy at or below $8.20 per megawatthour, and the APX Market Price at the time of clearing was $8.05 per megawatthour, the computer would clear those orders by forming a contract between the two parties for $8.05 per megawatthour. This example, furnished by the parties, assumes a bilateral contract, but in reality it will more often be the case that contracts formed through the APX market will be multilateral, although the role of the APX Market Price is unchanged.

10. *See, e.g., Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 1884 & n. 2, 138 L.Ed.2d 148 (1997); *United States v. 50 Acres of Land*, 469 U.S. 24, 25 n. 1, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984); *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Recording Indus. Ass'n of Am. v. Librarian of Congress*, 176 F.3d 528, 533 (D.C.Cir.1999).

■ The court reviews FERC's statutory interpretation under the now-familiar framework announced in *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Relying on the traditional tools of statutory construction, the court first considers whether Congress addressed the precise question at issue. *See Southern Cal. Edison Co. v. FERC,* 195 F.3d 17, 22–23 (D.C.Cir.1999). If Congress left ambiguous how the FPA is to apply to power exchanges, the court will uphold FERC's interpretation so long as it is reasonable. *See id.* Even if FERC's statutory interpretation might otherwise be reasonable, however, FERC must also interpret the Act consistently with its own precedent or explain its reasons for departure therefrom. *See Louisiana Pub. Serv. Comm'n v. FERC,* 184 F.3d 892, 897 (D.C.Cir.1999). Finally, when applying its interpretation of the Act, FERC must demonstrate that it has made a reasoned decision based upon substantial evidence in the record. *See Sithe/Independence Power Part., L.P. v. FERC,* 165 F.3d 944, 948 (D.C.Cir.1999).

■ APX's threshold contention—that either the plain meaning of the FPA or FERC precedent limits FERC jurisdiction to entities that, unlike APX, take title to the power—merits little discussion. The phrase "facilities ... for [wholesale] sale" of electricity admits of more than one meaning. Power exchanges such as APX did not exist when Congress enacted § 201 of the FPA, and while this fact alone does not foreclose the possibility that Congress enacted language directed at the precise issue at hand, it makes that possibility unlikely.[11] Moreover, the breadth of the statutory language and the absence of other indicia of congressional intent concerning the jurisdictional treatment of exchanges like APX demonstrates that Congress did not address the precise question at hand. *See, e.g., Military Toxics Project v. EPA,* 146 F.3d 948, 958 (D.C.Cir.1998); *Formula v. Heckler,* 779 F.2d 743, 758–59 (D.C.Cir.1985). Consequently, the question becomes, under *Chevron's* second step, whether FERC's construction of the FPA is reasonable. Again, given the breadth of the statutory language, FERC's interpretation of "facilities ... for [wholesale] sale" as encompassing facilities used to exercise effective control over the sale in a power exchange is a permissible construction of the FPA. Additionally, the FERC precedent on which APX relies does not limit public utilities to those entities that take title to power. *See, e.g., Washington Water Power Co.,* 74 FERC ¶ 61,033 at p. 61,083–84 (1996); *Citizens Energy Corp.,* 35 FERC at p. 61,453.

■ APX's next contention, that FERC's statutory interpretation in the orders under review is inconsistent with its precedents concerning power brokers and power marketers, fares no better. APX acknowledges that FERC relied on its statutory interpretation announced in the CalPX orders, but APX contends that interpretation is unlawful. Prior to the emergence of power exchanges, FERC had distinguished between power marketers (or resellers)—which were subject to FERC jurisdiction because they took title to electricity and therefore used contracts as paper facilities for the wholesale sale of electricity—and power brokers, which were not subject to FERC jurisdiction because they only acted as agents of the principals and had no proprietary interest in the electricity being purchased. *See Citizens Energy Corp.,* 35 FERC at p. 61,452–53.[12] APX maintains that it is no

11. Indeed, contrary to APX's position, the Second Circuit, in a pre-*Chevron* case in which the court specifically avoided reliance on the pre-*Chevron* form of judicial deference to administrative expertise, understood the plain meaning of "facilities" to be a "widely inclusive term, embracing anything which aids or makes easier the performance of the activities involved in the business of a person or corporation." *Hartford,* 131 F.2d at 961, 966.

12. *Citizens* involved a non-profit organization that sought to act as both a power broker and a power marketer. With respect to the brokering services, FERC opined that no ques-

more than a "high tech power broker" and that, therefore, the orders under review are contrary to *Citizens*, where FERC claimed jurisdiction because the non-profit organization would take title to power as a reseller, and that FERC has failed to offer a reasoned explanation for its departure from precedent.

Yet, FERC's decision in *Citizens* is not fairly read to have held that an entity owns facilities for the wholesale sale of electric power if, and only if, that entity takes title to the power. Similarly, in the power broker and related precedents cited by APX, FERC's reasoning did not address a situation in which an entity did not take title but played a role in setting the price at which wholesale power sales would occur. *See Washington Water Power Co.*, 74 FERC at p. 61,084 ("Washington Power represents that it would not have the obligation or ability to initiate, control, or change a transaction."); *Idaho Power Co.*, 74 FERC ¶ 61,149 at p. 61,524 (1996) (similar); *cf. LG & E Power Marketing, Inc.*, 68 FERC ¶ 61,247 at p. 62,125 (1994). Therefore, when FERC addressed how the FPA applies to power exchanges, it was not obliged to distinguish its power broker/power marketer precedents.[13]

■ APX maintains that even if the CalPX orders and *Continental* are the correct frame of reference, and that a power exchange is a public utility when it exercises effective control over sales, FERC arbitrarily concluded that APX exercised such control like CalPX and unlike Continental. FERC in fact recognized that APX does not play as interventionist a role as CalPX in pairing buyers and sellers and in setting the terms of their transactions, but the material similarity it identified was that the APX computer selects a price within the range set by participants and that price may be different from the price the participants would have selected had they engaged in direct negotiations. *See* Rehearing Order, 84 FERC at p. 61,086; Hearing Order, 82 FERC at p. 62,108. APX somewhat misses the point in its response that this observation is "irrelevant" because participants in its market voluntarily submit to its "price setting" role and are, therefore, not controlled by APX. FERC concluded that even if, under its current terms of service, APX may face economic disincentives from setting price at the highest possible point within the participants' range, because APX had the *power* to set a price different from one that would have resulted from direct negotiations, APX exercised effective control over sales in its market. Thus, FERC's analysis suffices to show that voluntary participation in APX's marketplace does not make irrelevant the potential gap between the APX-set price and a directly-negotiated price.

tion of jurisdiction appeared to arise. *See Citizens Energy Corp.*, 35 FERC at p. 1361,452. However, FERC asserted jurisdiction over Citizens with respect to its reselling services because it would be using paper facilities, such as contracts, accounts, and records, to engage in wholesale sales of electric power in interstate commerce. *See id.* at p. 61,453.

**13.** APX also contends that FERC's integral-to-the-transaction standard is inconsistent with other precedents in which FERC had held that an entity that schedules wholesale sales but that does not take title to power was not a public utility. *See Idaho Power Co.*, 74 FERC at p. 61,524–25. APX's contention would have force were FERC's standard read to include any actor without whom transactions may not occur. But FERC made clear that to the extent its standard carries with it a "but

for" component, that component is limited to those entities essential for a transaction to take place at a specific price. *See* Hearing Order, 82 FERC at p. 62,108 ("But for APX's intervention in the process, wholesale sales transactions between buyers and sellers will not necessarily occur at the specified market price.").

With respect to APX's contention that FERC failed to consider whether it need assert jurisdiction over APX in order to protect consumers inasmuch as FERC regulates sellers participating in APX transactions, because APX did not raise this issue before FERC in its rehearing request, the court lacks jurisdiction to consider it under FPA § 313(b). *See Granholm ex rel. Michigan Dep't of Natural Resources v. FERC*, 180 F.3d 278, 282 (D.C.Cir.1999).

■ However, there is some force to APX's argument that it is materially different from CalPX because all participants in APX's marketplace, unlike some of those in the CalPX market, can choose not to trade through APX's system at any time and can carefully calibrate their bids through price and time limits. FERC's analysis might have delved deeper into why the power to select a price within a range set by participants gives APX "control" over sales even when APX market participants, presumed to be rational profit-seekers, choose to rely on APX's computer to determine a market clearing price in lieu of direct negotiations, power brokers, CalPX, or any other marketplaces that may develop, particularly given that participants can exit from the APX marketplace at any time should inequities or more attractive alternatives appear. It is also true, as APX contends, that, under the Federal Power Act, Congress did not vest FERC with general jurisdiction over all participants in the wholesale electric power industry, regardless of whether the industry undergoes significant transformation not anticipated by Congress. *See Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 422–24, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975); *Henry v. FPC*, 513 F.2d 395, 401 (D.C.Cir.1975).

Nonetheless, Congress chose broad language to describe FERC's jurisdiction, and, under the applicable deferential standard of review, *see Public Util. Comm'n of the State of California v. FERC*, 143 F.3d 610, 615 (D.C.Cir.1998), the court cannot say that FERC unreasonably concluded that facilities used to exercise control over wholesale sales are subject to its jurisdiction and that the power to establish the price at which sales will take place, notwithstanding market participants' voluntary acquiescence in the exercise of such power, is sufficient to demonstrate such control. Although the roles APX and CalPX play in their respective markets differ in certain respects, FERC could reasonably focus, consistent with the standards it has adopted for operators of power exchanges, on the power to set price as being indicative of exercising control over wholesale sales of electricity. With respect to that criterion, the record supports FERC's view that APX is more like CalPX than Continental. Indeed, APX acknowledged in its brief that it "is no mere bystander in the market it operates." At oral argument APX conceded that participants who bid in the APX market are obliged to accept the price APX sets within the overlapping range established by the participants' bids, a price which, in theory, could always be set at the highest point in that range without the knowledge of participants or ratepayers. These acknowledgments are tantamount to a concession that APX is a *de facto* third party to the buyer-seller transaction, and, thus, that its services make it an integral part of the transaction.

Although FERC may conclude after a period of experience in the new computerized market for electricity that regulation of such entities as APX is no longer necessary, FERC could reasonably conclude in the orders under review that the manner in which APX participates in the sale and purchase makes it a *de facto* third party to the transaction and not simply a bystander that provides information that the parties can accept or reject. While the parties voluntarily decide to use APX's services and can set limits on the prices at which they will sell and buy, they are bound to the market price that APX sets within those limits once they submit a bid. So far as the record indicates, FERC has no way to determine at this point exactly where APX will set the market price; there is no experience to show whether the APX price may always be on the high end or, conversely, on the low end, of the parties' price range. Similarly, because APX treats information concerning the frequency of market clearing as a proprietary trade secret, it is unclear from the record how responsive the APX market price is likely to be to participants' bidding behavior, and, consequently, bidders' time limits may afford insufficient leverage. Notwithstanding FERC's determination that

prices set by APX for its services will be fair and just, it remains to be seen whether preferences or other forms of discrimination or unfairness may result from APX's operations.

Under these circumstances, FERC's determination is reasonable even if participants in APX's market have decided that savings from the lower transaction costs of the APX pricing system outweigh any of its disadvantages relative to a market-based, directly-negotiated pricing system. Although FERC might have taken a different tack, relying instead on indirect monitoring of APX through review of filings by public utilities that participate in the APX marketplace, *see* 16 U.S.C. § 824d(c); *LG&E Power Marketing, Inc.,* 68 FERC at p. 62,124, its decision to assert jurisdiction directly over APX is consistent with the Act and the standards FERC has adopted for power brokers and resellers. In time, FERC may agree that APX's price "setting" activities reflect the collective actions of the voluntary, profit-seeking participants in a market, and is undertaken as an agent of the parties rather than as an independent agent; but deference to FERC's expertise is due where it concludes that APX's *de facto* third-party role is substantively different from that of a traditional power broker over which FERC has previously disclaimed jurisdiction.

Finally, APX's challenge to the filing requirements FERC imposed is unpersuasive. In many respects, FERC has treated APX like other public utilities that lack market power, granting it the same waivers as those utilities. *See* Rehearing Order, 84 FERC at p. 61,086; Hearing Order, 82 FERC at p. 62,110. To the extent that APX has been treated differently, that treatment flows from the differences between the role APX plays in jurisdictional sales, and the role played by other public utilities granted market-based rate authority. FERC has no prior experience with a market like the one APX operates and it is entirely possible that the type of information it seeks to have

filed, namely, a detailed statement concerning APX's business, could ultimately cause FERC to conclude, in light of experience with the APX market, that there is no need for APX to be regulated. In the meantime, the court cannot conclude that FERC's filing requirements are arbitrary inasmuch as those requirements are reasonably related to FERC's legitimate regulatory concerns and to the differences between APX and other public utilities. APX's objections cannot overcome the fact that how APX adjusts the price goes to the essence of FERC's jurisdictional concern—to ensure that APX's rate-setting and power sales mechanisms are "just, reasonable, and not unduly discriminatory or preferential." Hearing Order, 82 FERC at 62, 107.

Accordingly, we deny the petition for review.