**SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Laidlaw Gas Recovery Systems, Inc., Intervenor.**

**No. 98–1439.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1999.

Decided Nov. 2, 1999.

Russell C. Swartz argued the cause for petitioner. With him on the briefs was Joseph E. Stubbs.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Douglas W. Smith, General Counsel, Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, Federal Energy Regulatory Commission.

Before: WILLIAMS, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Southern California Edison Company ("Edison") appeals two orders of the Federal Energy Regulatory Commission ("FERC") interpreting the "small power production facility" provision of § 3(17) of the Federal Power Act to permit such a facility to use fossil fuels to supplement alternative fuels in a manner not expressly authorized under the statute.[1] Edison contends that § 3(17)(A) & (B), on which FERC relied, is unambiguous, and consequently the two orders cannot stand. FERC, in response, contends that § 3(17)(B) is ambiguous and that the court must defer to FERC's reasonable interpretation of the statute inasmuch as it fosters the congressional purpose of encouraging the development of power production from alternative fuel sources by addressing circumstances that Congress could not have foreseen.

While there is a certain appeal to FERC's final point, neither FERC nor the court can ignore the plain terms of the

---

**1.** Section 3(17) of the Federal Power Act ("FPA") was added by § 201 of Public Utilities Regulatory Policies Act of 1978, 16 U.S.C. § 796(17) (1994).

statute. Section 3(17) is plainly crafted to allow small power producers to engage in a rather carefully defined set of exceptional uses for fossil fuels, whereas FERC has adopted an interpretation under which fossil fuel uses may encompass essentially whatever FERC may find desirable in light of policy considerations and various statutory goals. In contrast to FERC's interpretation, the rather obvious alternative reading offered by Edison gives effect to all of the text. FERC's interpretation of § 3(17) in the orders under review is also contradicted by FERC's own regulation. Consequently, FERC's continued application of its interpretation of § 3(17)(B) in *LUZ Solar Partners, Ltd.*, 30 FERC (CCH) ¶ 61,122 (1985), is inconsistent with the unambiguous terms of its post-*LUZ* regulation. Accordingly, on either ground, FERC's orders cannot stand, and we grant the petition.

## I.

The Public Utilities Regulatory Policies Act of 1978 ("PURPA"), Pub.L. No. 95–617, 92 Stat. 3117 *codified at* 16 U.S.C. §§ 796(17)-(18), 824a–3, 824i, 824k (1994), was one of five statutes enacted in 1978 as part of the National Energy Act, in response to the nation's fuel shortage.[2] At that time, approximately one-third of the electricity in the United States was generated through use of oil and natural gas, S.Rep. No. 95–361 at 32 (1977), and in the five-year period prior to enactment, oil costs had increased by approximately 400% and natural gas costs had increased

by more than 175%. S.Rep. No. 95–442 at 9 (1977). Responding to heightened fuel costs and potential fuel shortages, Congress sought to promote conservation of oil and natural gas by electricity utilities. *See FERC v. Mississippi*, 456 U.S. 742, 745–46, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Thus, to encourage the development of facilities that generate electricity using renewable resources and facilities engaged in cogeneration of electricity and useful heat or steam that might otherwise be wasted, *id.* at 750, 102 S.Ct. 2126, and to overcome the reluctance of traditional utilities to buy from, and sell to, these alternative producers, Congress granted qualifying small power production facilities certain benefits. Under PURPA, such facilities were exempt from certain regulatory controls, and they were assured a market by providing a right to interconnect with the local public utility and to receive rates, as prescribed by FERC, up to the full avoided cost of the utility. See *American Paper Inst. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 404–06, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983); PURPA §§ 210, 212, 16 U.S.C. §§ 824a–3, 824i, 824k.

Of relevance to the instant appeal are two provisions of PURPA and one provision of FERC's regulations. The first two define the features of a "small power production facility" potentially eligible for the statutory entitlements. The regulation, discussed in Part IV, further defines the permissible uses of fossil fuels by such a facility.[3] In § 3(17)(A), Congress defined

---

2. In addition to PURPA, Congress enacted the Energy Tax Act of 1978, Pub.L. No. 95–618, 92 Stat. 3174; the National Energy Conservation Policy Act, Pub.L. No. 95–619, 92 Stat. 3206; the Powerplant and Industrial Fuel Use Act of 1978, Pub.L. No. 95–620, 92 Stat. 3289; and the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3351. The statutory background has been discussed in related contexts in *American Paper Inst. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 404–06, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983), *rev'g, American Elec. Power v. FERC*, 675 F.2d 1226, 1229–31 (D.C.Cir.1982) (also discussing background); *FERC v. Mississippi*,

456 U.S. 742, 745–46, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); *New Charleston Power I, L.P. v. FERC*, 56 F.3d 1430, 1431–34 (D.C.Cir. 1995); *Independent Energy Producers Ass'n, Inc. v. California Pub. Util. Comm'n*, 36 F.3d 848, 850 (9th Cir.1994); *Puerto Rico Elec. Power Auth. v. FERC*, 848 F.2d 243, 244–45 (D.C.Cir.1988).

3. A fossil fuel is "a fuel (as in coal, oil, or natural gas) that is formed in the earth from plant or animal remains." Merriam Webster's Collegiate Dictionary 460 (10th ed.1993).

a "small power production facility," in pertinent part, to be:

> a facility which ... produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof[.]

16 U.S.C. § 796(17)(A)(i). Elaborating on the meaning of "primary energy source," Congress defined that term in § 3(17)(B) to mean:

> the fuel or fuels used for the generation of electric energy, except that such term does not include, as determined under rules prescribed by the Commission, in consultation with the Secretary of Energy—
>
>> (i) the minimum amounts of fuel required for ignition, startup, testing, flame stabilization, and control uses, and
>>
>> (ii) the minimum amounts of fuel required to alleviate or prevent—
>>
>>> (I) unanticipated equipment outages, and
>>>
>>> (II) emergencies, directly affecting the public health, safety, or welfare, which would result from electric power outages[.]

16 U.S.C. § 796(17)(B).

FERC also promulgated regulations under PURPA. Of significance here is FERC's amendment, effective February 24, 1995, which provided at the time Laidlaw sought a declaratory ruling that:

> (b) Fuel Use.
>
> . . . .
>
> (2) Use of oil, natural gas and coal by a facility, under section 3(17)(B) of the Federal Power Act, is limited to the minimum amounts of fuel required for ignition, startup, testing, flame stabilization, and control uses, and the minimum amounts of fuel required to alleviate or prevent unanticipated equipment outages, and emergencies, directly affecting the public health, safety, or welfare, which would result from electric power outages. Such fuel use may not, in the aggregate, exceed 25 percent of the total energy input of the facility during the 12–month period beginning with the date the facility first produces electric energy and any calendar year subsequent to the year in which the facility first produces electric energy.

18 C.F.R. § 292.204(b)(2) (1999).

## II.

Laidlaw Gas Recovery Systems, Inc. ("Laidlaw")[4] owns and operates 13 landfill gas-to-energy plants at which methane gas produced by decomposition is burned to generate electricity. On May 19, 1995, Laidlaw sought a declaratory ruling from FERC that its Coyote Canyon Landfill Gas Power Plant in Orange County, California, would remain a "qualifying small power production facility" under § 3(17)(C), and FERC's regulations, if it began burning natural gas in any amount up to 25% of its annual energy input. Specifically, Laidlaw requested permission to burn natural gas to boost output from 17 megawatts ("MW") to 20MW, to sustain output at that level despite fluctuations in landfill gas supply, and to alleviate the effects of forced outages and landfill maintenance.

Laidlaw's request for a declaratory ruling arose from its potential inability to supply the required power under its 30–year purchase power contract with Edison. In 1984, Laidlaw had agreed to supply Edison with at least 80% of Coyote Canyon's contract capacity during the peak hours of the four summer months. Initially, contract capacity had been 15MW, but the contract was amended in 1986 to increase contract capacity to 20MW. Once commercial operation at Coyote Canyon began in 1989, Laidlaw encountered difficulties. During the summer of 1989, Laidlaw failed to meet its contractual supply

---

**4.** Laidlaw has changed its name to Gas Recovery Systems, Inc., but for the sake of consistency we retain the designation used in the orders under review.

obligations, and, under the terms of the contract, Coyote Canyon's capacity was permanently derated to 17.1MW, and Laidlaw was forced to refund $600,000 to Edison. In 1990, the landfill was closed, but Laidlaw expects to have a commercially-sustainable gas supply until at least 2010.

According to Laidlaw's petition, Coyote Canyon's current production problems stem from two environmental requirements under state law, whereby the closed landfill has been covered with an 18–inch impermeable clay cover and condensation can not be reinjected, a process that would have increased the rate of decomposition and therefore gas production. Combined with the limitations imposed by the atmospheric pressure in southern California, implementation of the state requirements has resulted in a smaller gas supply than Laidlaw had anticipated.

Edison and the Public Utilities Commission of the State of California ("CPUC") intervened in opposition to the petition. Edison maintained that under PURPA Laidlaw was restricted in its use of natural gas to the purposes specified in the statute. Edison argued that Laidlaw could not justify its proposed use of natural gas as one of the specified uses in § 3(17)(B), nor could it meet the "essential fixed assets" standard enunciated in *LUZ* whereby FERC had recognized permissible uses for fossil fuels beyond those expressly set forth in the statute. *See Laidlaw Gas Recovery Sys., Inc.,* 74 FERC (CCH) ¶ 61,176 (1996) ("1996 Order"). Edison

concluded that even if Laidlaw could meet the *LUZ* standard, FERC should abandon it as no longer supported by the policy considerations that led to its adoption and as inconsistent with PURPA's plain language.[5]

In *LUZ,* FERC ruled that a solar-powered plant could burn fossil fuels to operate a gas-fired superheater, an oil-fired "emergency" steam generator, and an auxiliary gas-fired steam boiler even though these uses of fossil fuels were not expressly authorized under § 3(17)(A) & (B). *LUZ,* 30 FERC at p. 61,226. FERC reasoned that Congress' use of the word "primary" in § 3(17)(A) and (B) necessarily implied that there could be permissible secondary uses of fossil fuels. While FERC acknowledged that "Congress specified in section 3(17)(B) . . . certain uses of gas which fall into this secondary category," FERC determined that it remained free to permit additional secondary uses because Congress "did not explicitly state [that the secondary uses specified in § 3(17)(B) ] would be the sole [secondary uses] permitted." *LUZ,* 30 FERC at p. 61,225 (quoted in *Laidlaw Gas Recovery Sys., Inc.,* 84 FERC (CCH) ¶ 61,070 at p. 61,294–95 (1998)). FERC also determined, relying principally upon two brief passages from the Conference Report on PURPA, that the legislative history supported its interpretation. FERC relied on a reference to "other minor uses" in regard to the use of fossil fuels by a "small power production facility"[6] and a reference

---

5. CPUC joined Edison in arguing that Laidlaw's proposed use of natural gas would not fit within either the express uses permitted by PURPA or the use permitted under the *LUZ* standard. CPUC did not challenge the *LUZ* standard itself.

6. The term "small power production facility" derives from S. 2114 § 12(c)(4), which read: "small power production facility" means a facility owned by a person not primarily engaged in the generation or sale of electric power, which facility produces electric energy by the use of solid waste and/or renewable resources.

S. REP. No 95–442, 95th Cong. (1978). The relevant changes made by the Conference Committee were to change "which facility produces electric energy by the use of" to "a facility which . . . produces electric energy solely by the use, as a primary energy source, of," where "primary energy source" is a term of art defined in 16 U.S.C. § 796(17)(B). The Conference Report explains:

The conferees added the term 'primary energy source' to this definition in recognition of the fact that a facility using waste, biomass, or renewable resources, or any combination thereof as the primary fuel might nevertheless require the use of oil or natu-

to the use of natural gas or oil for the generation of electricity during "scheduled outages."[7] Given its determination that it was free to define permissible secondary uses of fossil fuels outside of those specified in § 3(17)(B), FERC concluded in *LUZ* that fossil fuels could be utilized to "improve[ ] the efficiency of those fixed assets of the small power production facility that are essential to the facility...." *LUZ*, 30 FERC at p. 61,226.

Applying *LUZ* in Laidlaw's case, FERC granted Laidlaw's petition in part. In the 1996 Order, FERC ruled that, without jeopardizing its status as qualifying small power production facility,[8] Laidlaw could use natural gas at its Coyote Canyon facility up to 25% of its energy input in order to "levelize" production at 17MW, as well as during forced outages and landfill maintenance; it denied Laidlaw's request to use natural gas to increase production to 20MW. 1996 Order, 74 FERC at p. 61,-615, (JA 167). Laidlaw and Edison sought rehearing, and by Order of July 21, 1998 ("1998 Order"),[9] FERC denied rehearing, rejecting Laidlaw's factual contention that the Coyote Canyon facility could produce 20MW using only landfill gas as unsupported. FERC rebuffed Edison's repeated attack on *LUZ* by reiterating in large measure its reasoning in *LUZ*. In response to Edison's request for clarification of the 1996 Order, FERC explained that Laidlaw could use natural gas to produce up to 17MW at its Coyote Canyon facility "when burning natural gas will permit the facilities to make more efficient use of their essential fixed assets." 1998 Order, 84 FERC at p. 61,296, (JA 236).

### III.

Edison appeals the 1996 and 1998 Orders on the principal ground that FERC would allow Coyote Canyon to burn natural gas up to 25% of its annual energy input contrary to the plain meaning of the statute that defines a "small power production facility." Relying on the statutory text and structure, Edison maintains that the permissible uses of fossil fuels by such a facility are expressly restricted to those set forth in the statute, which does not include a delegation of the authority to FERC to expand the permissible uses of fossil fuels and none may be implied. Consequently, Edison contends, FERC should have reconsidered and not extended the application of its decision in *LUZ* to the instant case. In addition, Edison maintains that FERC's reasoning is flawed because it fails to explain any link between the uses authorized by the statute and *LUZ*'s "essential fixed assets" standard, or why the uses permitted under *LUZ* are of the same character as those listed in the statute, and FERC relied on a factor—more efficient use—that Congress did not intend to be considered.

■ Under the now familiar *Chevron* test, this court must first determine whether Congress has addressed the precise issue at hand. *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). To do so, the court must exhaust the traditional tools of statutory construction. *Halverson*

---

ral gas or other nonrenewable fuels in emergencies or in outages or to start the unit, test it, stabilize the flame or control the operation of the unit *or for other minor uses.*

H.R. CONF. REP. No. 95–1750 at 89 (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. at 7823.

7. With regard to the definition of 'small power production facility' the conferees intend, for purposes of maintaining status as a small power production facility, that the phrase 'primary energy source' does not preclude the

use of gas or oil in a facility for the generation of electricity during scheduled outages.

H.R. CONF. REP. No. 95–1750 at 88–89 *reprinted in* 1978 U.S.C.C.A.N. at 7822–23.

8. On May 11, 1988, Laidlaw filed its notice of qualifying status as a "small power production facility." *See* 16 U.S.C. § 796(17)(C); 18 C.F.R. §§ 131.80, 292.203, 292.207.

9. *Laidlaw Gas Recovery Sys., Inc.*, 84 FERC ¶ 61,070 (1998), (JA 231).

*v. Slater*, 129 F.3d 180, 184 (D.C.Cir.1997); *accord Engine Mfr. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C.Cir.1996). Of course, the starting point, and the most traditional tool of statutory construction, is to read the text itself. *Engine Mfr. Ass'n*, 88 F.3d at 1088. To determine whether the plain meaning of the statutory text resolves the issue, the court considers "the particular statutory language at issue, as well as the language and design of the statute as a whole." *Halverson*, 129 F.3d at 184 (quoting *K Mart v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). Only then, if the court determines that Congress has not spoken to the question at issue, does *Chevron* step two come into play, requiring the court to defer to the agency's reasonable interpretation of the statute. In our *Chevron* step one discussion, we turn first to the text, then the structure of PURPA, and finally to the context.

### A.

■ Surely it is significant that in deciding to confer substantial benefits on "small power production facilit[ies]" Congress took care to define the class of potential beneficiaries. Thus, Congress required that such a facility must produce electric energy "solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof." Section 3(17)(A) of FPA, 16 U.S.C. § 796(17)(A). The limitation "solely" applies to the phrase "primary energy source," which, given the structure of the statute, is a term of art defining the full scope of permissible fuel uses. Read together, paragraphs (A) and (B) require that one or more of the alternative fuels listed in (A) be the sole fuel or fuels used to generate electricity except that the fuel used for specified uses related to maintaining power production or to disruptions in power production may be either alternative fuels or traditional fossil fuels. By excepting the fuel used for these secondary uses,

§ 3(17)(B) explains fully the use of the adjective "primary" in "primary energy source."

FERC's construction, on the other hand, strikes "solely" out of the statute and weakens the force of the command "primary." Essentially, FERC would rewrite § 3(17)(A)'s definition of a "small power production facility" to require such a facility to generate electricity "primarily" by the use of a permitted fuel as a primary energy source, rather than "solely" by such use. Under this interpretation, the statute can no longer include the .term "solely" and the court would have to condone striking a word from the statute. Yet FERC has not suggested any reason why it is necessary to do so. A reading that gives proper effect to the word "solely" does not turn it into a non sequitur, as Edison observes, nor does it produce absurd results. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1070–72 (D.C.Cir. 1998); *Engine Mfr. Ass'n*, 88 F.3d at 1089–90, 1092–93. Even FERC acknowledged that the definition of "primary energy source" provides a list of exceptions that are themselves permitted "secondary" fuel uses. *See* 1998 Order, 84 FERC at p. 61,295, (JA 235). Were additional nonconforming fuel uses permitted, the facility would not be producing electric energy solely by use of a permissible fuel.

In addition, in its brief FERC suggests that § 3(17)(B) refers only to those uses that FERC may *not* consider in determining a facility's *primary* energy source, but has no bearing upon permissible uses of *secondary* energy sources. FERC does not appear to base its decision in the orders on appeal on such an interpretation of § 3(17)(B). To the contrary, FERC acknowledged that § 3(17)(B) specifies permissible secondary energy source uses but argued that this list is not exhaustive and that Laidlaw's proposed fossil fuel uses constitute permissible uses of a secondary energy source. Indeed, in denying rehearing, FERC quoted *LUZ* to state that the language of subsection 17(B) can "be read

as not constraining [FERC] in implementing this section, from permitting *other* 'secondary' uses of fossil fuel." 1998 Order, 84 FERC at p. 61,294, 61,295, (JA 234–35) (emphasis added). Edison notes that FERC did not articulate a theory under which FERC could define secondary fuel uses, entirely unconstrained by § 3(17)(B), following identification of a facility's primary energy source.

But assuming FERC may have relied on such a rationale in the orders on appeal, *see LUZ*, 30 FERC at p. 61,225, FERC's approach is problematic. To adopt FERC's rationale is to assume a new category of nonconforming uses fueled by such a source that is nowhere mentioned in PURPA or FERC's regulations and is unnecessary to give meaning to the provisions Congress enacted. To suggest, as would FERC, that Congress' use of the word "primary" left undefined uses for secondary sources fails to give meaning to all of the terms that Congress used. Although as a linguistic matter "secondary" is a corollary of "primary," FERC's interpretation would have the effect of requiring Congress to state expressly that the exceptions in § 3(17)(B)(i) and (ii), which allow use of secondary fuels for certain uses, define the universe of permitted fossil fuel uses. Yet the court has repeatedly rejected the notion that the absence of an express proscription allows an agency to ignore a proscription implied by the limiting language of a statute, reasoning that such an approach requires "tortured statutory interpretation" and is based on the unlikely circumstance as to congressional intent giving agencies "virtually limitless hegemony, a result plainly out of keeping with *Chevron*." *Halverson*, 129 F.3d at 187 (quoting *Railway Labor Executives'*

*Ass'n v. National Mediation Bd.*, 29 F.3d 655, 671 (D.C.Cir.1994) (in banc)); *accord University of D.C. Faculty Ass'n v. District of Columbia Financial Responsibility and Management Assistance Auth.*, 163 F.3d 616, 621–22 (D.C.Cir.1998); *Engine Mfr. Ass'n*, 88 F.3d at 1088.

Here, the limiting language in § 3(17)(B) loses virtually all meaning if it delegates to FERC the authority to expand the character and types of conforming uses of fossil fuels. FERC's interpretation would mean that Congress intended to delegate authority so as to potentially nullify proscriptions it had otherwise set as a *quid pro quo* for entitlement to significant benefits. Instead, when the statutory words are given their common or normal meaning the result is a congressional scheme carefully designed to carry out the statutory purposes. As we have observed, the statutory language is plainly crafted to allow fossil fuel use by small power production facilities for only a rather carefully defined set of exceptional uses, whereas in the Orders on appeal and in *LUZ*, FERC applied an interpretation under which the fossil fuel uses may encompass essentially whatever FERC may find desirable in light of sound policy and the various statutory goals. This interpretation strips the substance from the word "solely" whereas the rather obvious alternative reading offered by Edison still allows "primary" to have a meaning, namely fuel uses other than the specified exceptions. Under *Chevron* an agency may not "avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy." *Engine Mfr. Ass'n*, 88 F.3d at 1089.

Laidlaw's reliance on the delegation of authority to FERC in § 3(17)(C) is similarly misplaced.[10] Laidlaw's interpretation

---

**10.** Section 3(17)(C) defines a "qualifying small power production facility" as

    a small power production facility—
    (i) which the Commission determines, by rule, meets such requirements (including requirements respecting fuel use, fuel efficiency, and reliability) as the Commission may, by rule, prescribe; and

    (ii) which is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)
16 U.S.C. § 796(17)(C).

of paragraph (C) seeks to broaden the set of "small power production facilities," as defined in paragraphs (A) and (B), when in reality the function of paragraph (C) is to carve out a subset of that category. Neither the 1996 Order nor the 1998 Order (nor *LUZ*) relies on paragraph (C) as authority for permitting Laidlaw's requested uses of natural gas; nor did Laidlaw seek rehearing on the ground that FERC should have authorized the requested uses as "control" uses under § 3(17)(B). Therefore, neither issue is before the court. *Burlington Truck Lines,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); 42 U.S.C. § 8251. Further, Laidlaw's view of paragraph (C) ignores the two separate definitions in § 3(17) that make "qualifying small power production facilit[ies]" under paragraph (C) a subset of the "small power production facilit[ies]" defined in paragraphs (A) and (B). And, contrary to Laidlaw's argument, Edison's interpretation does not read paragraph (C) out of the statute. FERC has specified requirements respecting fuel use by qualifying facilities, such as the 75%/25% rule in 18 C.F.R. § 292.204(b), whereby FERC defined the permissible amount of fuel for the exceptional uses in § 3(17)(B), assuring that these would remain secondary. 1996 Order, 74 FERC at p. 61,614 n. 1, (JA 166). Paragraph (C) delegates to FERC the authority, for instance, to add fuel use criteria after having defined the permissible amount of fuel for the exceptional uses in § 3(17)(B). FERC's 75%/25% rule is the product, in part, of FERC's exercise of the delegation in paragraph (C) and is consistent with Edison's interpretation of paragraphs (A) and (B).[11] Laidlaw's reliance on the Power Plant and Industrial Fuel Use Act of 1978, 42 U.S.C. §§ 8301–8484 (1995), is no more helpful to it; the term "primary energy source" in that statute is defined in nearly the same terms as were used in PURPA. *Compare* 42 U.S.C. § 8302(a)(15) (1994) *with* 16 U.S.C. § 796(17)(B).[12] Laidlaw's reliance on *LUZ*'s progeny fares no better.[13]

Finally, Laidlaw, like FERC, relies on PURPA's broad purpose of encouraging the development of small power production facilities to justify the *LUZ* standard. But that purpose is neither a grant of authority nor a basis on which the court can ignore a statutory limitation. It bears noting that Laidlaw's Coyote Canyon facility and other small power production facilities have been developed and have operated without the interpretation that FERC has given to the statute in the orders on appeal; indeed, Edison has suggested that, contrary to congressional purpose, the orders on appeal encourage the use of additional fossil fuel and ignore protection of ratepayers from rate increases attributable to mandatory purchases from qualifying facilities. Indeed, at oral argument counsel for Edison represented that many small power production facilities operate in accord with the congressional design.

### B.

The structure of the statute lends weight to the conclusion that Congress

---

**11.** Edison does not challenge the regulation allowing use of fossil fuel up to 25% of the annual energy input for the exceptional uses in § 3(17)(B). *See* 18 C.F.R. § 292.204. *Cf. New Charleston Power I, L.P. v. FERC,* 56 F.3d 1430, 1432–33 (D.C.Cir.1995).

**12.** *See also* S.Rep. No. 95–361 at 27–28, 42 (1977) *reprinted in* 1978 U.S.C.C.A.N. 8173, 8173, 8188.

**13.** *LUZ* has been relied on sparingly by FERC. *See Power Developers, Inc.,* 32 FERC (CCH) ¶ 61,101 (1985), *order on reh'g,* 34 FERC ¶ 61,136 (1986); *Northeastern Power Company,* 34 FERC (CCH) ¶ 61,197 (1986); *Energy Tech. Eng'g Ctr.* 43 FERC (CCH) ¶ 61,251 (1988); *Hydro Corp. of Penn.,* 43 FERC (CCH) ¶ 61,276 (1988); *see also County Sanitation Districts of Orange County, Cal.,* 41 FERC (CCH) ¶ 62,244 (1987) (Office Director opinion). Edison maintains that inasmuch as *LUZ* has been applied on a case-by-case basis, the instant case is the first time that FERC's essential fixed assets standard has been presented to a court for review. *Cf. Brown v. Gardner,* 513 U.S. 115, 122, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

intended that the only permissible uses of fossil fuels by a small power production facility would be the fuel uses specified in paragraph (B). Congress set out the relevant definitions beginning with "small power production facility," followed by "primary energy source," followed by "qualifying small power production facility." *See* 16 U.S.C. § 796(17)(A), (B), & (C). The first definition defines the facility based on fuel use and size, and, as Edison notes, only then authorizes FERC to determine which facilities are "qualifying" facilities. Paragraph (A) thus relies on paragraph (B) to define the facilities that come within the class of "small power production facilities", while paragraph (C) authorizes FERC to determine a qualifying subset of paragraph (A) facilities. By setting out a general definition in paragraph (A), and then refining the term "primary energy source" in paragraph (B), the exceptions explain the use of the word "primary" in that phrase. FERC has no authority under paragraph (B) to expand the list of fossil fuels that are not expressly stated in the statute. And under paragraph (C), FERC's authority is to define by rule requirements that allow certain small power production facilities to become qualifying facilities. These in turn must first be "small power production facilit[ies]."

## C.

Finally, the context in which Congress enacted PURPA also supports the *Chevron* step one analysis. At the time of a national energy crisis, Congress sought in a variety of ways to reduce the use of natural gas for electricity generation. *FERC v. Mississippi*, 456 U.S. 742, 745–46, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); S.Rep. No. 95–442 at 9 (1977). PURPA was designed to encourage the development of alternative sources of energy by eliminating preexisting barriers, and in so doing, the Act authorized limited uses of fossil fuels. While Congress might also have enacted a statute that allowed uses of natural gas to maximize or increase the production "efficiency" focusing on the "essential fixed assets" of "small power production facilities," its choice of language and structure weigh heavily in support of the conclusion that it did not do so. Rather it seems clear from the language and structure it chose that Congress envisioned alternative fuel sources being developed without the additional use of natural gas as part of the regular and permanent production process; the exceptions it authorized for fossil fuel use in the statute are of a limited number and character—for emergency, maintenance and quality control. *See American Electric Power Serv. v. FERC*, 675 F.2d 1226, 1230 n. 1 (D.C.Cir.1982), *rev'd in part sub nom., American Paper Inst. v. American Electric Power Serv. Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). If, as FERC would have it, Congress could not have foreseen all of the circumstances under which it would be advisable to allow natural gas to be used in the production of electricity with alternative fuel sources, then Congress should not have defined the permissible fuel uses by small power production facilities with such precision, using the word "solely" in describing the alternative fuels to be used as the "primary energy source."

The context further suggests that in exchange for significant benefits involving exemption from certain regulations and a guaranteed market, Congress required small power production facilities to generate electricity from alternative sources of energy with only limited uses of fossil fuels. Those purposes, Congress indicated in the statute, were of a startup, testing, or emergency nature, as opposed to a continuing and permanent usage associated directly with the production of electricity. This was the *quid pro quo*. FERC has not so far shown that the uses permitted in the orders under review are of the kind or character that Congress expressly permitted.

Upon examination of the text, structure, and context of the statute, we conclude that Edison has correctly construed § 3(17)(A) & (B), giving rather obvious meaning to all of the words and phrases that Congress used, and leaving no ambiguity to resolve at step two of *Chevron*. By failing to adhere to the statutory limitations, FERC has impermissibly construed the statute. Where Congress has taken care, given the benefits it would confer, to specify exceptions for usages otherwise prohibited, the court has no reason to assume ambiguity for the purpose of allowing the agency to improve, in its view, upon Congress' design. Hence, we conclude that FERC's 1996 and 1998 Orders incorporate an impermissible construction of the provisions of PURPA defining a "small power production facility."

## IV.

■ An additional reason for rejecting FERC's interpretation of § 3(17)(A) & (B) in the orders under review is that this interpretation is contradicted by the plain terms of FERC's regulation, which is consistent with the statutory text as construed under our *Chevron* step one analysis and seemingly inconsistent with FERC's prior interpretation of the statute in *LUZ* before the amended regulations were in place.

As originally promulgated in 1980, 18 C.F.R. § 292.204(b) provided only that "use of oil, natural gas, and coal by a facility may not, in the aggregate, exceed 25 percent of the total energy input of the facility during any calendar year period." 18 C.F.R. § 292.204(b) (1994). The preamble to the 1980 rule stated that use of fossil fuel was restricted to the purposes specified in the statute. Order No. 70, 45 Fed.Reg. 17,959, 17,966 (Mar. 20, 1980). In *LUZ*, FERC acknowledged this preamble in concluding that the more expansive reading of the regulation was in error.

*LUZ*, 30 FERC at 61,227–28 n. 7. Nonetheless, the *LUZ* decision authorized usage beyond the statutory uses specified, and thus was contrary even to FERC's rules as they existed when *LUZ* was decided.[14]

In any event, at the time Laidlaw filed its request for a declaratory order, FERC's regulation expressly identified permissible uses for fossil fuels by a small power production facility. Before Laidlaw sought a declaratory ruling from FERC, FERC had amended § 292.204(b) in 1995 to state that the use of fossil fuels is "limited" to the uses enumerated in the regulation, which are identical to those expressly permitted in the statute. *See* 18 C.F.R. § 292.204(b) (1999). How FERC can reconcile the provisions of its regulations with its 1996 and 1998 Orders is unclear. In the 1996 Order, FERC described the amendment to § 292.204(b) as codifying FERC's longstanding interpretation of the rule under which fossil fuels could be used only "for statutorily permissible purposes up to the 25 percent limit." 1996 Order, 74 FERC at p. 61,614 n. 1, (JA 166). In its brief on appeal, FERC concedes that § 292.204(b) "closely tracks" the statutory exceptions in 16 U.S.C. § 796(17)(B). In fact, the regulation directly mimics the statute.

FERC's contention that the *LUZ* standard sets forth a permissible use for fossil fuel is belied by the absence of any mention of *LUZ* or "essential fixed assets" from both the text of the amended rule and its preamble. *See generally* 18 C.F.R. § 292.204(b); Order No. 575, 60 Fed.Reg. 4831, 4847 (Jan. 25, 1995). On the contrary, in *LUZ*, and in the orders under review, FERC permitted facilities to burn fossil fuels under the "essential fixed assets" standard as a permissible "other minor use" under § 3(17)(B). *See LUZ*, 30 FERC at p. 61,225–26; 1996 Order, 74 FERC at p. 61,615–16, (JA 167–68); 1998

---

14. Indeed, FERC acknowledged in *Power Developers, Inc.*, 34 FERC (CCH) ¶ 61,136 (1986), *on reh'g from* 32 FERC ¶ 61,101 (1985), that *LUZ*'s "essential fixed assets"

standard is appropriately viewed as a loosening of the regulatory restrictions. 34 FERC at p. 61,236.

Order, 84 FERC at p. 61,294–95, (JA 234–35). While the court's review of an agency's interpretation of its own regulation is deferential, *see, e.g., Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), FERC's reliance on *LUZ* in the 1996 and 1998 Orders cannot be sustained. Treating the "essential fixed assets" use as permissible under § 3(17)(B), as FERC did in *LUZ* and the orders under review, is inconsistent with the regulation, which directs that "[u]se of oil, natural gas and coal by a facility, under section [3](17)(B) . . . is limited to the minimum amounts of fuel required for" the express purposes in § 3(17)(B)(i) and (ii). 18 C.F.R. § 292.204(b)(2).

Accordingly, because the 1996 and 1998 Orders rely on an interpretation of § 3(17) that is foreclosed by unambiguous statutory text, and, alternatively, by FERC's own regulation, we grant Edison's petition for review.