# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 1, 2016                    Decided April 7, 2017

No. 15-5199

UNITED STATES ASSOCIATION OF REPTILE KEEPERS, INC., ET
AL.,
APPELLEES

v.

RYAN ZINKE, THE HONORABLE, IN HIS OFFICIAL CAPACITY AS
THE SECRETARY OF THE INTERIOR AND UNITED STATES FISH
AND WILDLIFE SERVICE,
APPELLANTS

HUMANE SOCIETY OF THE UNITED STATES AND CENTER FOR
BIOLOGICAL DIVERSITY,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-02007)

---

*Emily A. Polachek*, Attorney, U.S. Department of Justice,
argued the cause for federal appellants. With her on the briefs
were *John C. Cruden*, Assistant Attorney General, and
*Meredith L. Flax*, Attorney.

*George Kimbrell*, *Sr.* was on the brief for *amicus curiae*
The Center for Invasive Species Prevention, Natural Areas

Association and the Wildlife Society in support of defendants-appellants.

David E. Frulla argued the cause for appellees U.S. Association of Reptile Keepers, Inc., et al. With him on the brief were Paul C. Rosenthal and Shaun M. Gehan.

Collette L. Adkins and Anna E. Frostic were on the briefs for defendant-intervenors/appellees The Humane Society of the United States and Center for Biological Diversity.

Before: TATEL, SRINIVASAN, and WILKINS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SRINIVASAN.

SRINIVASAN, Circuit Judge: A federal statute known as the Lacey Act enables the Secretary of the Interior to designate certain species of animals as injurious to humans, wildlife, agriculture, horticulture, or forestry. When a species is designated as injurious, the Act prohibits any importation of the species into the United States or its possessions or territories. 18 U.S.C. § 42(a)(1). The Act additionally bars "any shipment" of the species "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States." Id.

This case concerns the proper interpretation of the latter provision, which we will refer to as the shipment clause. All agree that the clause bars shipments of injurious species between each of the listed jurisdictions—for instance, shipments of animals between "Hawaii" and "the continental United States," or between "the Commonwealth of Puerto Rico" and a "possession of the United States." But what about shipments between the states making up "the continental

United States"—for instance, shipments between Virginia and Maryland? Does the clause prohibit those shipments as well?

The government believes the answer is yes. It reads the shipment clause not only to bar shipments between the continental United States and the other listed jurisdictions, but also to prohibit shipments between any of the 49 States comprising the continental United States. The plaintiffs in this case, individuals who breed and sell animals, disagree. In their view, the shipment clause has no bearing on shipments of animals from one of the 49 continental United States to another.

The district court sided with the plaintiffs' interpretation. The court thus preliminarily enjoined enforcement of a Fish and Wildlife Service rule barring interstate shipments of two species of snakes deemed to be injurious. We agree with the district court's understanding of the shipment clause. We therefore affirm the court's decision.

I.

A.

Since its enactment in 1900, a principal "object and purpose" of the Lacey Act has been "to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed." Lacey Act, ch. 553, § 1, 31 Stat. 187, 188 (1900) (codified as amended at 16 U.S.C. § 701). In furtherance of that objective, the Act established a criminal prohibition against importation into the country of certain identified species and such additional species "as the Secretary of Agriculture may from time to time declare injurious to the interest of agriculture or horticulture." 31 Stat.

at 188. That prohibition, which we will call the import clause, later became codified at 18 U.S.C. § 42.

In 1960, Congress sought "[t]o clarify certain provisions of the Criminal Code relating to the importation or shipment of injurious mammals, birds, amphibians, fish, and reptiles." Pub. L. No. 86-702, 74 Stat. 753, 753 (1960) (citing 18 U.S.C. § 42). To that end, Congress enacted the clause directly in issue here—the shipment clause—and appended it to the import clause. The shipment clause, as noted at the outset of this opinion, makes it illegal to ship injurious animals "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States." 74 Stat. at 753-54 (now codified at 18 U.S.C. § 42(a)).

The import and shipment clauses, in their current formulations, read as follows (with the shipment clause italicized for demarcation):

> The importation into the United States, any territory of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States, *or any shipment between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States*, of [enumerated species] and such other species . . . which the Secretary of the Interior may prescribe by regulation to be injurious to human beings, to the interests of agriculture, horticulture, forestry, or to wildlife or the wildlife resources of the United States, is hereby prohibited.

18 U.S.C. § 42(a)(1) (emphasis added).

For some time after the shipment clause's enactment in 1960, the Department of the Interior, in proposed rulemakings and in testimony before Congress, understood the clause to prohibit shipments of injurious animals between the listed jurisdictions (for instance, shipments between "Hawaii" and the "continental United States") but not to bar interstate shipments within the "continental United States" itself (for instance, shipments between Kansas and Virginia). *See U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 148-49 (D.D.C. 2015). The Department has since shifted course. In recent years, whenever the Secretary of Interior, acting through the Fish and Wildlife Service, promulgates a rule designating a new species as injurious, the rule's preamble notes that the designation results in a prohibition against any interstate transport of the species. *See, e.g.*, 80 Fed. Reg. 12,702, 12,702 (Mar. 10, 2015). The government, that is, now interprets the shipment clause to prohibit all interstate shipments of injurious species: the clause, under that interpretation, bars shipments not only between the "continental United States" and "Hawaii" but also bars shipments between the 49 continental States—thereby barring all interstate shipments.

## B.

On December 18, 2013, the United States Association of Reptile Keepers and various individuals (ARK) filed the underlying action in the district court, challenging a 2012 rule in which the Fish and Wildlife Service designated as injurious four species of snakes not in issue in this appeal. *See* 77 Fed. Reg. 3,330 (Jan. 23, 2012). ARK argued that the Service lacks authority under the Lacey Act to prohibit transportation of the listed species between the 49 continental States. The shipment clause, ARK argued, speaks solely to shipments from one listed

jurisdiction to another, and therefore does not address interstate shipments within the continental United States itself.

On March 10, 2015, the Service issued a rule designating four additional species of snakes as injurious, including the two species in issue here: the reticulated python and the green anaconda. *See* 80 Fed. Reg. 12,702. Those two species are no garden-variety snakes. Reticulated pythons can grow to a length of more than 28 feet and have been known to eat humans. Green anacondas are the world's heaviest snakes, attaining a weight in excess of 400 pounds and growing to about 22 feet in length. Both species can reproduce via parthenogenesis, a process by which numerous offspring can hatch from a female's unfertilized egg, enhancing the species' ability to establish themselves in the wild and to resist efforts to control their populations.

ARK amended its complaint to include a challenge to the 2015 rule. ARK's members breed and sell reticulated pythons and green anacondas. Its members have legally acquired each snake, but if the shipment clause prohibits all shipments of listed injurious species from one continental State to another, ARK's members would face criminal penalties (a fine or up to six months of imprisonment, *see* 18 U.S.C. § 42(b)) for shipping the two species across state lines.

ARK filed an application for a temporary restraining order seeking to prohibit the 2015 rule from going into effect. The district court converted ARK's application for a temporary restraining order into a motion for a preliminary injunction. On the merits, the court concluded that the shipment clause does not reach shipments between the 49 continental States, such that the Service lacks authority to bar transport of the designated snakes between those States. *See Reptile Keepers*, 103 F. Supp. 3d at 143-44, 159. The district court therefore

granted a preliminary injunction, and the government now appeals.

## II.

To the extent the district court's decision to enter a preliminary injunction "hinges on questions of law, . . . our review is essentially *de novo*." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (internal quotation marks omitted). The central issue before us concerns the scope of the Lacey Act's shipment clause: does the clause prohibit shipments of injurious animals from one of the 49 continental States to another? We, like the district court, conclude that the clause's prohibition does not speak to shipments between the continental States.

At the outset, we note that the procedural context of this appeal does not prevent us from definitively deciding the merits of the shipment clause's meaning. The district court's entry of a preliminary injunction turned on whether the party seeking relief (here, ARK) is "likely" to succeed on the merits, rather than on a final disposition of the merits. *See Reptile Keepers*, 103 F. Supp. 3d at 141. Our review, however, "is not confined" to the grant or denial of injunctive relief. *See Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 833 (D.C. Cir. 2009) (quoting *Munaf v. Geren*, 553 U.S. 674, 691 (2007)). When, as here, the ruling under review "rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance," we may resolve the merits "even though the appeal is from the entry of a preliminary injunction." *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 757 (1985), *overruled on other grounds by Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992). We reach a definitive judgment on the shipment clause's meaning in order to "save

the parties the expense of future litigation." *See id.* at 756-757; *see also* 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3921.1 (3d ed. 2017).

A.

Our interpretation of the shipment clause "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). The shipment clause prohibits any shipment of an injurious species "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States." 18 U.S.C. § 42(a)(1).

The parties agree that the statute prohibits shipment of an injurious species from any of the listed jurisdictions to any other listed jurisdiction. We know, consequently, that there can be no shipments between Hawaii and Puerto Rico, or between Guam (a possession of the United States) and the District of Columbia. We likewise know, with regard to "the continental United States," that there can be no shipments from the continental United States to Hawaii (or vice versa), or from the continental United States to Puerto Rico (or vice versa).

While it is common ground that the shipment clause prohibits shipments between the continental United States and any of the other listed jurisdictions, what about shipments between the 49 "continental United States" themselves— between Virginia and Maryland, for instance? The government submits that the shipment clause bars those shipments as well. ARK argues otherwise. We agree with ARK.

ARK's interpretation of the shipment clause is "mandated by the grammatical structure of the statute." *Ron Pair*, 489 U.S. at 241. When the word "between" introduces multiple items, it "expresses one-to-one relations" between the identified items. Bryan A. Garner, *Garner's Modern American Usage* 101 (3d ed. 2009); *see also Chicago Manual of Style* § 5.220. While "between," when used to introduce multiple items, therefore speaks to relationships between—i.e., across—the listed items, it ordinarily expresses nothing about relationships *within* any one of the listed items.

Consider, for instance, a notice to travelers saying the following: "Due to the weather, any flights between California cities are cancelled." That bulletin imparts information about the status of flights within the sole listed item ("California cities")—i.e., information about flights from one California city to another. Now, consider instead a bulletin which uses "between" to introduce a list of two items rather than just the one: "Due to the weather, any flights between California cities and New York are cancelled." That notice speaks in terms of a one-to-one relationship between the two listed items: it communicates that there will be no flights from California cities (collectively) to New York, and vice versa. It says nothing, however, about the effect of the weather on flights within the first listed item alone—that is, flights between California cities.

The same is true of the shipment clause, which carries a parallel structure. *See* 18 U.S.C. § 42(a)(1). Whereas the hypothetical travel bulletin says that "any flights" between "California cities" and "New York" are cancelled, the shipment clause says that "any shipment" between "the continental United States" and "Hawaii" is prohibited. Just as the travel notice tells us something about flights between California cities (collectively) and New York, while saying nothing about

flights between each California city, the shipment clause tells us something about shipments between the continental United States (collectively) and Hawaii, while saying nothing about shipments between the 49 continental States.

The shipment clause of course references not just the "continental United States" and "Hawaii," but also includes in its list of jurisdictions "the Commonwealth of Puerto Rico," the "District of Columbia," and "any possession of the United States." The use of "between" to introduce more than two objects does not alter the proper understanding of the clause. "*Between* has long been recognized as being perfectly appropriate for more than two objects if multiple one-to-one relationships are understood from the context." *Chicago Manual of Style* § 5.220; *see* Garner, *supra*, at 101-02. In such a situation, in other words, "between" denotes that each listed object shares a one-to-one relationship with each of the other objects. It still indicates nothing, though, about relationships within any of the listed objects itself.

That is true, for instance, of the following observation: "there are no games between National Football League teams, Major League Baseball teams, and National Basketball Association teams." That sentence speaks in terms of multiple one-to-one relationships—viz., the relationship of each of the listed professional sports leagues to the other leagues. It expresses that there are no games in which an NFL team plays against an MLB team, no games in which an MLB team plays against an NBA team, and no games in which an NBA team plays against an NFL team. The sentence, however, tells us nothing about relationships within any of the listed leagues. It does not, for example, indicate that there are no games in which an NFL team plays against another NFL team.

The shipment clause operates in the same manner. It addresses (and prohibits) shipments from each listed jurisdiction to each of the other jurisdictions. It says nothing about shipments within one of the listed jurisdictions (the continental United States).

The government sees substantial significance in the shipment clause's use of the disjunctive "or," rather than the conjunctive "and," when enumerating the listed jurisdictions. The clause, the government stresses, prohibits shipments "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, *or* any possession of the United States." 18 U.S.C. § 42(a)(1) (emphasis added). The word "or," to the government, means that the clause not only prohibits shipments from the continental United States to the other jurisdictions (and vice versa), but also bars shipments from any of the 49 continental States to any other continental State.

"Or" cannot do the work demanded of it by the government. The use of "or" in a list introduced by "between" is non-idiomatic. One commonly cited usage manual thus observes that the "natural conjunction linking elements introduced by *between* is *and* . . . , but *or*" is "occasionally encountered and . . . always regrettable." R.W. Burchfield, *The New Fowler's Modern English Usage* 107 (3d ed. 2000).

The ordinary remedy for the "always regrettable" use of "or" in connection with "between" is simply to read "or" as "and." *Id.*; *see* Garner, *supra*, at 103. A reference to a choice "between payment in money *or* in kind" therefore is readily understood to express a choice between payment in money *and* in kind. Burchfield, *supra*, at 107 (emphasis altered). So, too, with the shipment clause: the non-idiomatic "or" is best

understood as "and," such that the use of "or" rather than "and" should have no effect on the clause's meaning.

The word "or" in the shipment clause, regardless, could not bear the specific weight given to it by the government. At most, the non-idiomatic use of "or" in connection with a list of objects introduced by "between" could give rise to ambiguity about whether the statement speaks to one-to-one relationships across the listed items or instead speaks to relationships within each listed item. The government, however, reads the shipment clause to prohibit *both* shipments across the listed jurisdictions (between the continental United States and Hawaii, for instance) *and* shipments within a listed jurisdiction (from one continental State to another). There is no support for assigning "between" double duty of that kind merely because it is paired with "or."

Consider, for instance, a facsimile of the sports-league example introduced earlier which states that "there are no games between NFL teams *or* MLB teams." If we read "or" as "and," then, as before, the statement would address games between NFL teams *and* MLB teams, expressing that there are no games across leagues in which an NFL team plays against an MLB team. The statement would say nothing about games within each league—i.e., games between one NFL team and another. But even if we were to understand "or" to mean something other than "and," we would then read the statement to say that there are no games between NFL teams *or between* MLB teams. Under that alternative interpretation, the statement would tell us that there are no games in which one NFL team plays another, or in which one MLB team plays another. But this time, while we would know something about relationships within each league (games between two NFL teams), we would know nothing about relationships across the leagues (games between an NFL team and an MLB team).

13

For our purposes, the critical point is that each of the two alternative understandings of the "between/or" clause speaks *either* to relationships across the listed objects *or* to relationships within each listed object, but not to both. Here, all parties (including the government) agree that the shipment clause prohibits shipments across the listed jurisdictions—i.e., from the continental United States to Hawaii, and vice versa. The clause, then, cannot also speak to shipments within the continental United States itself—i.e., from one continental State to another.

That becomes particularly evident when taking into account that the shipment clause's listed jurisdictions include singular (as opposed to plural) entities: Hawaii, Puerto Rico, the District of Columbia, and any possession of the United States. Even if one could read the phrase, "there are no games between NFL teams or MLB teams," to mean "there are no games between NFL teams *or between* MLB teams," that reading is possible only because both objects of "between" in that example are plural. No such interpretation is available when the list of objects introduced by "between" includes singular items. A statute barring "shipments between the continental United States or Puerto Rico" cannot be read to prohibit "shipments between the continental United States *or between* Puerto Rico." It would make no sense to speak in terms of barring "shipments between Puerto Rico."

For those reasons, the shipment clause is best read—indeed, can only be read—solely to prohibit shipments from one listed jurisdiction to another. The clause does not speak to shipments within the continental United States itself. That understanding, for the reasons explained, holds true regardless of whether "the continental United States" in the clause is conceived of as a singular or plural item. Even if the latter, the clause's remaining listed jurisdictions are singular. The clause

thus must be understood to prohibit shipments across its listed jurisdictions without addressing shipments within a particular listed jurisdiction. The clause consequently does not speak to shipments of injurious species from one continental State to another.

Because we see no ambiguity in the shipment clause's terms in this regard, we have no need to address the parties' dispute about whether we should defer to the Fish and Wildlife Service's contrary interpretation of the relevant language. The parties disagree on whether ordinary principles of *Chevron* deference apply to an agency's interpretation of a criminal provision like the shipment clause. *Chevron* deference, however, "come[s] into play" only when we must resolve statutory ambiguity. *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23, 27 (D.C. Cir. 1999). Because we read the shipment clause to be clear, we have no occasion to address whether we would defer to the agency's resolution of any ambiguous statutory terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

B.

Our interpretation of the shipment clause is consistent with the evolution of the Lacey Act's terms over time. Before the addition of the shipment clause in 1960, the import clause—the provision to which the shipment clause would be appended— simply prohibited the "importation into the United States of" injurious species. Act of June 25, 1948, ch. 645, 62 Stat. 683, 687 (1948). The "United States" for purposes of the Act encompassed its territories (which at the time included Hawaii and Puerto Rico), as well as its possessions. *See* 62 Stat. at 685. The Act therefore prohibited imports from foreign countries into the United States and its territories and possessions, but it

contained no distinct bar against transport of injurious species to the country's mainland from its territories or possessions.

In 1960, Congress amended the Act in part by adding, to the bar against imports "into the United States," the shipment clause's prohibition against shipments "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States." Pub. L. No. 86-702, 74 Stat. 753, 753 (1960). By singling out the "continental United States" as a distinct object, Congress manifested a desire to protect the mainland from shipments of injurious species from Hawaii (which had just become a state in 1959, *see* Pub. L. No. 86-3, 73 Stat. 4 (1959)), from Puerto Rico, and from island possessions such as the United States Virgin Islands and Guam.

"[A]lthough we need not rely on legislative history given the text's clarity, we note that the history only supports our interpretation" of the 1960 amendments. *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1710 (2012). The Department of the Interior drafted the bill which eventually became those amendments. The Assistant Director, Bureau of Sport Fisheries and Wildlife, testified about the amendment on the Department's behalf at a House of Representatives subcommittee hearing. In outlining the rationale for adding the shipment clause, he stated that "we have broadened the language a bit to prohibit the shipment between the Continental United States and Hawaii, Puerto Rico, and the Virgin Islands of the Mongoose, for this reason: Currently the Mongoose occurs in Hawaii, Puerto Rico, and the Virgin Islands." *H.R. 10329 and H.R. 10598: Hearing Before the House Comm. on the Judiciary*, 86th Cong. 6 (1960) (statement of Lansing A.

Parker, Assistant Director of the Bureau of Sport Fisheries and Wildlife, Department of the Interior).

That description reinforces the conclusion we independently draw from the text of the amendments: the addition of the shipment clause enabled Congress to protect the continental United States against the introduction of injurious species found in Hawaii, Puerto Rico, and any United States possession. The government, though, understands the clause to do much more than that. It reads the clause not only to bar shipments of injurious species into the continental United States from Hawaii and the other jurisdictions (and vice versa), but also to prohibit any shipments between the remaining 49 States. Had Congress desired to achieve the latter objective, however, there would have been no need to reference Hawaii and the continental United States separately. Rather, Congress simply could have barred shipments between "any State" (which by 1960 included Hawaii).

In fact, Congress used precisely that formulation in a neighboring provision of the Lacey Act. *See* 74 Stat. at 754. The provision, which the parties refer to as the trade provision, pertains to the transport of animals that have been illegally obtained or taken. In the same 1960 amendments which added the shipment clause, Congress also amended the trade provision to prohibit carrying or transporting illegally obtained animals "*to or from any State*, territory, the District of Columbia, the Commonwealth of Puerto Rico, any possession of the United States, or any foreign country." *Id.* (emphasis added) (codified as amended at 18 U.S.C. § 43, now codified as further amended at 16 U.S.C. § 3372(a)(1)). That language

plainly prohibits interstate shipments of animals subject to the trade provision.

If Congress likewise wanted to address interstate shipments of animals in the shipment clause, Congress could have (and presumably would have) used parallel language when enacting that clause in a neighboring section of the same amendments. *See* 74 Stat. at 753. Congress instead referred separately to "Hawaii" and the "continental United States" in the shipment clause, manifesting a narrower concern to protect the continental United States against the introduction of injurious species found in Hawaii, Puerto Rico, or United States possessions.

The shipment clause, while specifically referencing those jurisdictions (the "continental United States," "Hawaii," the "Commonwealth of Puerto Rico," and "any possession of the United States"), also lists the "District of Columbia." To the government, the reference to the District of Columbia necessarily means that the shipment clause prohibits all interstate shipments. Why, the government asks, would Congress bar shipments of injurious species between Virginia and the District of Columbia while allowing shipments of the same species between Virginia and Maryland? We are unpersuaded by the government's reliance on the clause's listing of the District of Columbia.

For starters, under the government's reading of the shipment clause, the clause's reference to the District of Columbia would be superfluous, which we generally assume Congress would not have intended. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Congress defined the phrase "continental United States" in a statute enacted by the same Congress in the year before the 1960 addition of the shipment clause. *See* Pub. L. No. 86-70, § 48, 73 Stat. 141, 154

(1959); *see also* 1 U.S.C. § 1 note. Under that definition, "[w]henever the phrase 'continental United States' is used in any law of the United States enacted after the date of the enactment of this Act, it shall mean the 49 States on the North American Continent *and the District of Columbia*, unless otherwise expressly provided." *Id.* (emphasis added). In light of that definition, if, as the government urges, the shipment clause already barred the shipment of injurious species between the continental States, there would have been no need to list the District of Columbia separately.

The government, at any rate, is wrong to assume there could be no reason for Congress to prohibit the shipment of injurious animals from Virginia to the District without also barring shipments from Virginia to Maryland. The government's argument to that effect overlooks Congress's special legislative relationship with the District. The Constitution grants Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may . . . become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. That is, "Congress, when it legislates for the District, stands in the same relation to District residents as a state legislature does to residents of its own state." *Banner v. United States*, 428 F.3d 303, 308 (D.C. Cir. 2005) (emphasis omitted). That was particularly true when the shipment clause came into being in 1960, more than a decade before the enactment of the Home Rule Act (which delegated "certain legislative powers to the government of the District of Columbia"). Pub. L. No. 93-198, 87 Stat. 774, 777 (1973).

Before the Home Rule Act, consequently, Congress alone had the ability to establish an import ban for the District of Columbia. Individual states, by contrast, could protect themselves by enacting their own laws prohibiting the

importation into their borders of invasive species. *See Maine v. Taylor*, 477 U.S. 131, 151-52 (1986). Indeed, a number of states restrict or prohibit the importation of injurious species into their territory, with some of those laws specifically cross-referencing species deemed injurious under the Lacey Act. *See, e.g.*, Ala. Admin. Code r. 220-2-.26; Ark. Admin Code 002.00.1-09.11; Conn. Agencies Regs. § 26-55-6; 301 Ky. Admin. Regs. 2:082; Mo. Code Regs. Ann. tit. 3 § 10-4.117; Nev. Admin Code § 503.110; N.Y. Comp. Codes R. & Regs. tit. 6, § 575.3; Or. Admin. R. 635-056-0050; 4 Va. Admin. Code § 15-30-40. Congress evidently exercised its own unique authority over the District of Columbia in the shipment clause in an effort to afford the same protection to the District. If so, that would explain why Congress protected the District against shipments from Virginia while leaving Maryland to protect itself against those shipments.

The government presses various additional arguments grounded in the Lacey Act's history in support of its reading of the shipment clause, none of which persuades us. For instance, the government relies on the 1960 amendments to the aforementioned trade provision. That provision, as noted, pertains to the transport of animals that have been illegally obtained or taken, including members of an injurious species imported in violation of the import clause. Before the 1960 amendments, the trade provision barred any transport, delivery, or shipment of such animals, including from one state to another. *See* 18 U.S.C. § 43 (1948). The government understands the 1960 amendments to have removed the trade provision's prohibition against interstate transport of illegally imported animals, and to have reconstituted that bar in the

shipment clause as a prohibition against interstate shipment of all injurious animals.

The premise of the government's argument is misconceived. While Congress amended the language of the trade provision in 1960, the provision retained its prohibition against interstate transport of animals imported from a foreign country in violation of the import clause. The trade provision, as amended in 1960, prohibited "deliver[ing], carr[ying], transport[ing], ship[ping] . . . or knowingly receiv[ing] for shipment" (including across state lines) any animal "which was captured, killed, taken, purchased, sold, or otherwise possessed or transported *in any manner contrary to any Act of Congress* or regulation issued pursuant thereto" or any state, territorial, or foreign law. 18 U.S.C. § 43 (1960) (emphasis added). The import clause was an "Act of Congress" banning importation into the United States of any injurious species. 18 U.S.C. § 42 (1960). Consequently, as with the pre-amendment version of the trade provision, the 1960 version made it unlawful to ship interstate any injurious animal imported in violation of the import clause.

The government separately argues that Congress, in actions since 1960, has either ratified the government's present interpretation of the shipment clause or has amended the statute by implication so as to bring about that interpretation. The crux of the government's argument lies in a series of laws amending the Lacey Act's injurious-species list to include the zebra mussel, brown tree snake, and bighead carp. *See* Pub. L. No. 101-646, § 1208, 104 Stat. 4761, 4772 (1990) (zebra mussel); Pub. L. No. 102-237, § 1013(e), 105 Stat. 1818, 1901 (1991) (brown tree snake); Pub. L. No. 111-307, § 2, 124 Stat. 3282, 3282 (2010) (bighead carp). By the time of those amendments, as now, the Fish and Wildlife Service had been construing the Lacey Act to bar all interstate transport of listed injurious

species. *See, e.g.*, 54 Fed. Reg. 22,286, 22,287 (May 23, 1989). The government highlights legislative history suggesting that at least some members of Congress, perhaps informed by the Service's interpretation of the statute, thought the amendments would criminalize interstate shipment of the newly listed species.

The government's arguments cannot overcome the plain text of the shipment clause. When, as here, "the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). Similarly, we will not understand Congress to have amended an act by implication unless there is a "positive repugnancy" between the provisions of the preexisting and newly enacted statutes, as well as language manifesting Congress's "considered determination" of the ostensible change. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) (alteration omitted) (quoting *In re Penn Cent. Transp. Co.*, 384 F. Supp. 895, 943 (Reg'l Rail Reorg. Ct. 1974)). The government falls short on both scores here.

Even if some members of Congress might have assumed that the amendments to the list of injurious species would criminalize all interstate shipments of zebra mussels, brown tree snakes, and bighead carp, applying the shipment clause's original, and more circumscribed, prohibition would not be "repugnant" to those amendments. As written, the statute would still criminalize the future importation of those species as well as the future shipment of the species between the jurisdictions listed in the shipment clause. That effect is fully consistent with Congress's intent to regulate the newly listed species. There is no evidence, moreover, that Congress affirmatively considered the purported effect of its targeted amendments on all injurious species under the Lacey Act.

We therefore decline to conclude that Congress, by implication, altered the meaning of the shipment clause's terms so as to criminalize the interstate shipment of every Lacey Act species. Rather, the clause continues to mean what it has meant since its enactment:  it prohibits the shipment of injurious species between the listed jurisdictions, including to and from the continental United States, but it does not speak to shipments between the 49 continental States.

\* \* \* \* \*

For the foregoing reasons, we affirm the district court's judgment and hold as a matter of law that the government lacks authority under the shipment clause to prohibit shipments of injurious species between the continental States.

*So ordered.*